561 So.2d 44 (1990)
Elka Freeman, Wife of/and Stanley M. DIEFENTHAL, Beatrice Badger, Wife of/and Hughes de la Vergne, Paul J. Leaman, Jr., Dotty Gold, Wife of/and Max Nathan, Jr., Carole Crowell Pettit, Gretchen Kuntz, Wife of/and John Elms, Stephany Sherry, Wife of/and William Monteleone, Margaret Carolyn Ott, Wife of/and Dr. Phillip R. Loria
v.
LONGUE VUE MANAGEMENT CORPORATION, Longue Vue Foundation, and Longue Vue House and Gardens Advisory Corporation.
No. 89-C-2880.
Supreme Court of Louisiana.
April 30, 1990.
Rehearing Denied May 24, 1990.
*46 Alan Goodman, Maryann Liuzza, Lemle & Kelleher, New Orleans, for applicant.
Michael R. O'Keefe, III, Benjamin Slater, Jr., Monroe & Lemann, New Orleans, for respondent.
Kathy Lee Torregano, Deputy City Atty., Okla Jones, II, City Atty., William D. Aaron, Jr., Chief Deputy City Atty., amicus curiae for City of New Orleans.
W. Thomas Tete, Mars, Medo & Tete, New Orleans, amicus curiae for Greater New Orleans Tourist & Convention Com'n.
SHORTESS, Justice Pro Tem.
At issue is whether Longue Vue House and Gardens, a museum located adjacent to a residential neighborhood, can allow use of its facility for large, outdoor functions *47 which allegedly violated restrictive covenants governing use of the property.
Longue Vue was built in the 1930's as a home for the late philanthropists Edith and Edgar Stern. Both the house and gardens are now open for tours and, in addition, are rented for weddings and other parties. Located on eight acres in Metairie, Longue Vue is relatively secluded. It is bounded on the east by the New Orleans Country Club golf course, on the west by Bamboo Road, and on the south by Palmetto Street. On the north, however, Longue Vue is bounded by plaintiffs' residences, all of which front on Garden Lane. This street, which is a mere 710 feet long, is private and is the site of a very quiet and elegant neighborhood. Plaintiffs[1] and defendants are the sole owners or lessees of all property which fronts on or abuts Garden Lane. Until 1977, Garden Lane provided the sole means of access to Longue Vue.
In 1931, the Garden Lane property owners, including Mr. Stern and plaintiffs' predecessors in interest, entered into covenants wherein they agreed their property would be used only for single-family residential dwellings and not for business or commercial purposes. Plaintiffs contend that in the neighborhood's early days the Sterns were leading proponents of the so-called "sanctity" of Garden Lane. In the 1960's, Mrs. Stern, who was proud of the landscaped gardens on her property, asked the other Garden Lane residents if they would object if she opened them to the public one afternoon a week. According to Stanley Diefenthal, who has lived on Garden Lane since 1949, the one afternoon a week became two, then three. Nevertheless, the few daytime visitors to the gardens posed little problem for the other residents.
Then, sometime around 1970, Mrs. Stern decided the house, which is furnished with an eclectic collection of decorative arts, should be dedicated to public use at her death. She unsuccessfully tried to donate the property to the Landmark Society and then to the U.S. State Department for a school for diplomats. When a proposed donation of the property to the New Orleans Museum of Art (NOMA) was blocked because of conflict with municipal zoning ordinances, the City Council passed an ordinance allowing any house with four acres to be opened as a museum. This ordinance was not introduced at trial, yet the legality of Longue Vue's operation as a museum has not been challenged. Despite this action, her offer to donate the property to NOMA was finally refused. As a consequence, Mrs. Stern created and funded the Longue Vue Foundation which now operates the museum through its management arm, the Longue Vue House and Gardens Advisory Corporation.[2]
From the start, plaintiffs and their predecessors were opposed to Mrs. Stern's transformation of Longue Vue into a museum because of their desire to maintain the peacefulness of their neighborhood, their fear that Garden Lane could not accommodate the demands of an increased number of Longue Vue visitors, and their dismay that use of the gardens had progressively become a greater nuisance. In 1973 they filed a suit seeking to enjoin expanded public use of the Stern property. This litigation eventually led to a 1977 settlement agreement wherein each party gave up something of what they wanted. Mrs. Stern, who wanted Garden Lane to remain a public street,[3] agreed the street would become private, that the public could no longer use it as a means of access to Longue Vue, and that an alternate public entrance would be developed. In accord with this provision, a public entrance to Longue Vue was created on Bamboo Road and is now apparently used by most guests and *48 service persons.[4] In exchange for this concession on the part of Mrs. Stern, the plaintiffs agreed to allow her to make Longue Vue into a museum and adopted a modification of the 1931 agreement which "relaxed" the ban on commercial use of Garden Lane property only in certain respects concerning the Stern property. The applicable paragraph provides:
2. The restriction against use of any property situated or abutting on Garden Lane for any purpose other than for a private residence, as provided in the aforesaid Act before Watts K. Leverich, Notary Public, dated 16 December 1931 [the 1931 agreement barring use of Garden Lane property for commercial purposes], shall be relaxed as to the property owned by Mrs. Stern in the following respects only:

a. Longue Vue Gardens may be opened to the public and a charge may be made for admission thereto.
b. The "Main House", which is presently being used by Mrs. Stern as a private residence, and outbuildings may be used as a museum and a charge may be made for admission thereto.
c. The "Playhouse" may be used for private or semi-private meetings of nonprofit groups of which Mrs. Stern is a member or sponsor or in which she is an active participant and also for such meetings under the sponsorship of Longue Vue Gardens or Museum. The number of such meetings held at night shall not exceed three (3) in any one week.
(Emphasis added.)
As early as 1979, Garden Lane residents complained that Longue Vue was violating the 1977 ban on public use of the street. In October of 1979, then-resident Murphy Moss and plaintiff Max Nathan, Jr., wrote a letter on behalf of the other residents complaining of parking on and use of Garden Lane by caterers and serving persons working at Longue Vue during functions held there by the American Bankers Association. Then again in 1984, the Diefenthals wrote a letter complaining that Longue Vue had violated the agreement on several occasions, especially during a 1983 wedding when caterers and guests used Garden Lane as a means of entry to Longue Vue. During this time, the noise level and frequency of Longue Vue functions do not appear to have been a serious issue because some of the residents themselves hosted parties at Longue Vue.[5]
The Longue Vue property supports several buildings including the "main house," formerly the Stern residence, and now the site of most of the museum exhibits. Other buildings on the property include former garages and a guesthouse, now used for a museum shop and administrative offices. There are also several greenhouses and a reception building for orientation of visitors near the Bamboo Road entrance. Just to the north of the main house are the Playhouse, where the Sterns entertained their guests, and an area called the Pavillion. The Pavillion is the former tennis court covered by a permanent awning with sides that can be raised or lowered.
Although the main house is open for tours, parties are never held in that building. Some functions held at Longue Vue, such as weddings or cocktail parties with perhaps entertainment by a band, take place in the gardens on the south side of the house. On the other hand, most food service, whether it be wine and cheese, tea and cookies, or buffet or sit-down dinner, *49 takes place on the north side of the property in or near the "Playhouse." Because of limited space in the Playhouse, Longue Vue's director, Florence Treadway, testified she does not like to allow functions with more than 65 guests in that building. The awning-covered Pavillion was erected to accommodate the overflow. These two structures, the Playhouse and Pavillion, are to the north of the main house and are separated from Garden Lane only by a service drive that runs along the edge of Longue Vue's property. It is in this area that Longue Vue has been allowing large, late-night gatherings to be held.
The record shows that cocktail parties and dinners were hosted at Longue Vue in 1987 by groups as diverse as CBS, MCI, Squibb Pharmaceuticals, the Republican National Convention, and Tulane Law School. In addition, a number of private individuals rented Longue Vue for various functions. The number of guests at these functions ranged from 100 to 750, various refreshments and meals were served, and entertainment was provided by jazz groups, a gospel choir, rhythm and blues and rock groups, and Scottish bagpipers. Some of the music was amplified; Ms. Treadway concedes that a band called "Impulse" was "obnoxiously loud." However, the choice of music and catering for a party held at Longue Vue has in the past been left to the discretion of those hosting the function. The defendants have merely required notification of the host's plans. Parties that last longer than the time stipulated by contract result in an additional hourly charge for the length of the added time.
In 1987, parties were held at Longue Vue both during the day and in the evening, and on weekdays and weekends. Sometimes functions were held on consecutive days of the same week. For example, the Republican National Convention entertained 600 guests each night for four consecutive nights. Irving Trust, which provided its guests with entertainment by the Preservation Hall Jazz Band one evening, hosted cocktail parties with seated dinners on two consecutive nights. In October, Squibb Pharmaceuticals hosted a dinner for 750 doctors which lasted from 8 to 11 p.m. with music by Clarence "Frogman" Henry and a gospel choir. Events in 1987 often did not end until 11 p.m. and occasionally lasted until midnight or 1 a.m. Treadway conceded that, depending on the number of guests, cleanup by the caterers requires between one and three hours. Cleanup takes place in the Playhouse court area which faces Garden Lane, and in an adjoining parking lot near the Pettit property. Loria, who lives across the street from the Playhouse and service drive area, testified he has been disturbed by cleanup crews piling equipment into trucks and honking horns as late as 4 a.m.
Due to the New Orleans climate, many of the functions at Longue Vue occur in the spring and summer when the weather is most congenial. Diefenthal, who lives at the other end of Garden Lane from Longue Vue, a distance of approximately 700 feet, testified he is unable to open his windows even if the weather is nice because of the noise created by some of these parties. Furthermore, because the Playhouse includes limited restroom facilities, defendants have at times placed portable toilets along the edge of their property nearest Garden Lane to accommodate guests at larger functions. The plaintiffs complain of the visibility of these structures from Garden Lane. Finally, plaintiffs contend that despite prior complaints to defendants, trucks servicing Longue Vue functions are still parked along Garden Lane, sometimes for the entire day preceding a party.
Because persons hosting parties at Longue Vue make their own arrangements for food, beverages, service, and musical entertainment, Longue Vue's income from these functions is limited to a grounds fee, ranging from as little as $1500 or $2000 to as much as $10,000. This sliding scale apparently depends on who gives the function, as well as how many guests attend and what activities take place. In addition, Longue Vue charges a per capita fee so that each guest can take a tour of either the house ($5.00) or the gardens ($2.50).
Daytime tours with service of tea or luncheon were held at Longue Vue as early *50 as 1975 and the first evening cocktail/dinner party in 1978; however, Treadway admits that since 1981 and 1982 there has been a "dramatic increase" in special events held at Longue Vue. Plaintiffs claim these functions were more frequent in 1987 than in 1986; however, Treadway, who has been Longue Vue's executive director since 1981, testified that the 32 parties held in 1987 were actually two less than the number held in 1986.
At any rate, in 1987, these events generated $153,000 in grounds and admission fees, an amount that a 1987 report to defendants' board called "relatively insignificant." This is so because Mrs. Stern funded the museum with a substantial fund which between her death in 1980 and the spring of 1987 had doubled to $8.3 million. Although defendants claim they lost $2 million of this in the 1987 stock market crash, no evidence in support of that claim was introduced and the fund continues to cover the bulk of Longue Vue's expenses. In 1987, the Foundation allotted $500,000 for operating costs with an additional $150,000 allotted to pay for the digging of a new well.
The record shows the defendants consider increased use of the facility for parties and tours as a possible source of additional revenues. At the same time, the record also shows at least some board members question whether the facility can accommodate an increasing number of special events and whether such functions are compatible with the Longue Vue "mission" which is:
to preserve and interpret the mid-twentieth century lifestyle of philantropists [sic], Edgar and Edith Stern; and to make their House and Gardens available to the public as a Museum, Cultural Center, and educational resource for the Decorative Arts and Horticulture.
Before filing suit, the plaintiffs contend, they complained about the increased frequency of and disturbance created by these special events on at least a dozen occasions. They contend their complaints were met with defendants' repeated assurances that their concerns would be addressed but that these assurances have not been fulfilled. Instead, they claim defendants' activities have become more of a nuisance. Defendants, meanwhile, assert they received only three complaints from the plaintiffs before a December 1987 demand letter and that these complaints concerned not the noise of the parties but the visibility of activities in the courtyard and the noise created by early-morning gardening and leaf blowing.
In their 1988 suit, plaintiffs sought (1) a declaratory judgment that defendants were in violation of the 1931 and 1977 agreements and (2) an injunction prohibiting all activities which violate the covenants. After trial, the trial judge found defendants in violation of the covenants, which he construed to mean the following: the Playhouse may be used only for meetings of groups sponsored by Longue Vue and for no more than three night meetings per week; the main house and outbuildings may be used as a museum only between 8 a.m. and 6 p.m.; the gardens may be open to the public only between 8 a.m. and 6 p.m.; no hot meals can be served; music can only be provided by violinists, harpists, and pianists; portable toilets are prohibited unless needed for construction work or an emergency not caused by defendants allowing a large group on the property. The trial judge issued an injunction against any activities not in compliance with these guidelines. He reasoned that even if municipal zoning ordinances allow Longue Vue to operate as a museum, the provisions of the restrictive covenants supersede such ordinances. He also concluded that renting the premises for functions including catering and bands is not part of the normal operation of a museum. Instead, the trial judge found service of catered, hot meals with alcoholic beverages and musical entertainment by bands are "accessory uses" which are akin to activities of a restaurant or night club and which adversely affect the locale of plaintiffs' residences.
Upon defendants' appeal, the court of appeal set aside the trial court judgment, rendered its own declaratory judgment, and again issued a permanent injunction. 550 So.2d 1220. In considering the scope *51 of the 1931 and 1977 agreements, that court found the trial judge failed to strictly construe and thus went beyond the scope of those covenants. In its own interpretation of the agreements, the court of appeal held that since the 1977 agreement allows only meetings in the Playhouse, parties cannot be held there. However, the 1977 agreement, in allowing Mrs. Stern to open the remainder of the property to the public, failed to specify what activities can be held in those other areas. Applying civil code principles, the appellate court found this lack of specificity mandated a ruling in favor of Longue Vue. Thus, under the injunction issued by the court of appeal, defendants can hold meetings only in the Playhouse but can allow parties with any type of beverage, food, entertainment, and number of guests anywhere else on the property.
The plaintiffs applied for writs and we granted certiorari. There are three questions before us: 1) whether defendants are in violation of the restrictive covenants; 2) whether plaintiffs have waived or forfeited the benefit of the covenants through abandonment; 3) whether the defendants' activities constitute a nuisance.
THE SCOPE OF THE RESTRICTIVE COVENANTS:
The law is clear that building restriction clauses constitute real rights, not personal to the vendor, and inure to the benefit of all other grantees under a general plan of development, and are real rights running with the land; and that the remedy of the other grantees to prevent a violation of the restrictions by another is by injunction. Edwards v. Wiseman, 198 La. 382, 3 So.2d 661, 663 (1941). In this case, the restrictions on usages of the properties constitute a general plan of development and were properly filed, thus giving constructive knowledge of their contents to all prospective purchasers.[6]
Restrictive covenants are to be construed strictly. Clark v. Manuel, 463 So.2d 1276, 1279 (La.1985). In addition, interpretation of a contract is the determination of the common intent of the parties. C.C. art. 2045. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. C.C. art. 2046. The words of a contract must be given their generally prevailing meaning. C.C. art. 2047.
In light of these principles, defendants argue the trial court erred in accepting plaintiffs' parol evidence of their intent in signing the 1977 agreement. Although parol evidence is inadmissible to vary terms of a written contract, when the terms of a written contract are susceptible to more than one interpretation, or there is uncertainty or ambiguity as to its provisions, or the intent of the parties cannot be ascertained from the language employed, parol evidence is admissible to clarify the ambiguity and to show the intent of the parties. Dixie Campers, Inc. v. Vesely Co., 398 So.2d 1087, 1089 (La.1981).[7] It is not necessary to revert to parol evidence to conclude that the 1931 agreement prohibited commercial activity and the 1977 agreement relaxed that prohibition only in regard to the property of Mrs. Stern and then only in certain respects. Further, the parol evidence introduced did not vary the terms of the agreements but merely supported their clear import.
In the 1931 agreement, the Garden Lane property owners agreed, among other things, that "no part of the property owned by them ... shall ever be sold, used, leased or otherwise permitted to be employed, directly or indirectly, for business or commercial purposes of any description or for anything but private residences and out *52 buildings appurtenant thereto...." Then in 1977, in return for Mrs. Stern's agreement that the public would not use Garden Lane for access to Longue Vue, she received a limited relaxation of the ban on commercial use of her property. The history of this controversy and a close reading of the 1977 covenant show the goal of the residents was to allow Mrs. Stern to open Longue Vue yet to restrict the property's use and thus preserve the atmosphere of the neighborhood. Thus, Paragraph 2 of the 1977 agreement provided the prohibition on commercial use was relaxed on the Stern property "in the following respects only":
a. Longue Vue Gardens may be opened to the public and a charge may be made for admission thereto.
In this provision, the plaintiffs acknowledged the gardens could be opened for a fee, as had been customary for several years prior to that time. Defendants argue that having consented to public admission to the gardens, plaintiffs consented to unrestricted activities therein. We find that argument unpersuasive. At the time of the 1977 agreement the gardens were open merely for public daytime tours, and it is hence unreasonable to believe either the plaintiffs or Mrs. Stern envisioned the possibility that the gardens would become attractive as the site of regularly-scheduled weddings and cocktail parties. Plaintiffs who signed the agreement testified they intended to allow the gardens to be opened for public tours and we find that the scope of this provision means simply that.
Paragraph 2 also provided:
b. The "Main House", which is presently being used by Mrs. Stern as a private residence, and outbuildings may be used as a museum and a charge may be made for admission thereto.
In accord with this subparagraph, the Sterns' residence has been opened as a museum. Guests are expected to remain in certain areas, are not allowed to bring in food and, during their tour, are required to deposit their beverage glasses at a table near the entrance. Defendants have not argued that the main house is an appropriate setting for parties and the Sterns, while they were living, entertained guests in the Playhouse.
Although the house and outbuildings have been converted to a museum, it is unlikely that the litigants envisioned in 1977 that parties at Longue Vue would become an issue. John Bullard, director of the New Orleans Museum of Art (NOMA) since 1973 and member of various national professional groups, testified that although it has now become commonplace for museums to rent their facilities for private parties, it would not have occurred to him in 1977 that this would be an income source.
Defendants presented evidence showing, and amici curiae, the City of New Orleans and the Greater New Orleans Tourist Commission, argue in brief, that other local museums rent their facilities for parties. Thus, they contend Longue Vue is also entitled to do so. We do not doubt that museums throughout the country engage in this activity without disturbing their neighbors, but those practices do not dictate the conclusion that Longue Vue, merely because it is a museum, may host parties. The local museums which defendants cite as examples, Gallier House, Hermann-Grima House and the state museum, are located in the French Quarter, a potpourri of residences and commercial establishments. Likewise, NOMA, which in the last decade has rented its facility for large private functions, is located within the confines of City Park, where its nearest residential neighbor is perhaps one-half mile away.
Longue Vue, on the other hand, was a stately home located on the edge of a peaceful, exclusive neighborhood and was converted into a museum. When the neighbors permitted Mrs. Stern to change her home into a museum, they were not consenting to any nonresidential activities other those enumerated in the 1977 agreement.
Defendants argue that opening the house at night for tours in conjunction with parties where food and beverages are served is a legitimate museum purpose, since visitors are also there to enjoy the beauty of *53 the house and gardens. They contend that because hosts pay for a tour of either the house or gardens by each party guest, the party is actually incidental to enjoyment of the Longue Vue property. Similarly, the amici briefs emphasize the importance of Longue Vue as a tourism resource and argue convention visitors whose days are occupied with meetings will be unable to partake of Longue Vue's cultural offerings unless they can visit at night. We find these arguments without merit. There is a difference between food and beverages offered in conjunction with a tour, where the primary purpose is enjoyment of the house and gardens, and a tour offered in conjunction with the service of food and beverage, where the primary purpose is socializing. In the latter case, the house and gardens merely provide a lovely setting and the tour is of secondary importance.
The trial judge said a museum is "an institution devoted to the procurement, care, study, and display of objects of lasting interest or value; also, a place where objects are exhibited." Applying this definition to the provision, defendants are permitted in the main house and outbuildings to conduct tours, exhibits, demonstrations, and other activities concerned with the functions of a museum. Moreover, administrative offices are necessary to the operation of the museum and plaintiffs do not object to defendants' operation of a gift shop.
Finally, the 1977 agreement contained this provision:
c. The "Playhouse" may be used for private or semi-private meetings of nonprofit groups of which Mrs. Stern is a member or sponsor or in which she is an active participant and also for such meetings under the sponsorship of Longue Vue Gardens or Museum. The number of such meetings held at night shall not exceed three (3) in any one week.
The plaintiffs concede they wanted to permit Mrs. Stern to open the house and gardens to the public for an admission fee. They also concede they were not bothered by Mrs. Stern holding meetings of garden clubs, needlework societies, and other groups to which she belonged in the Playhouse as she had been doing and thus agreed to allow such activities to continue. As Diefenthal testified, "[t]here would have been no problem created had the [sub] Paragraph C been adhered to." This provision apparently narrowly limits activities which can take place in the Playhouse, yet defendants have resorted to several arguments in order to justify their use of that structure and the adjoining Pavillion for social events.
Defendants concede that groups like McDermott International, MCI, and Irving Trust cannot be classified as "nonprofit groups" but nonetheless argue that a party in the Playhouse is essentially a "meeting" of the group holding the function. They suggest that parties at Longue Vue can be considered under the "sponsorship" of Longue Vue because defendants assume responsibility for groups hosting functions on its premises. Alternatively, defendants argue parties would fall within the scope of this provision if Longue Vue charges hosts a membership fee in Friends of Longue Vue, in which case the parties would be "sponsored" by Longue Vue. Finally, they argue the Playhouse is an outbuilding and is therefore subject to Paragraph 2(b), and that 2(c) merely defines additional uses for that structure. We reject all these arguments.
As Judge Barry of the Court of Appeal, Fourth Circuit, said in concurring, "parties" are not synonymous with "meetings." To allow Longue Vue to avoid operation of the provision by charging hosts a membership fee would subvert the terms of the agreement. Because we find Paragraph 2(b) limits Longue Vue to activities connected with the operation of a museum, as that term is commonly understood, Longue Vue's argument that 2(c) merely defines additional uses for the Playhouse provides defendants with no relief. Instead, we find Paragraph 2(c) sets out the sole activities which can take place in the Playhouse.
In yet another argument, the defendants have said the agreements are silent as to parties, that neither the 1931 nor 1977 agreements bar any of the residents from *54 holding parties on their properties, and that because the other residents have held large parties, including a fund-raiser for George Bush hosted by the de la Vergnes, they are also allowed to do so. The comparison is inapposite, for none of the residents have regularly engaged in hosting parties in order to raise income. In addition, none of the other residents have regularly engaged in large, outdoor, late-night parties with amplified music as Longue Vue has.
Since Paragraph 2(c) clearly delineates the activities allowed in the Playhouse, the court of appeal found use of that building is restricted to those uses. This interpretation of 2(c), with which we agree, precludes the hosting of parties in the Playhouse. Meanwhile, because it found no such clarity or specificity of allowed activities in Paragraph 2(a) and (b), the court of appeal applied C.C. art. 783[8] to those provisions and held that Longue Vue can essentially allow whatever activities it chooses on the rest of its property. We disagree that there is doubt as to the validity, existence, or extent of the covenants at issue and hence set that judgment aside.
Defendants admit the "special events" being held at Longue Vue are commercial activities within the sense of money changing hands, yet we find nothing in the agreements between the parties which would allow these functions. The provision as a whole was designed to "maintain the status quo" by allowing Mrs. Stern to open the house and gardens to public view and to continue to hold meetings of groups she sponsored. In light of the history between the parties and the clear language of Paragraph 2, the activities allowed under the 1931 and 1977 agreements are these: the gardens may be opened to the public for viewing, the house and other outbuildings may be used for museum purposes within the ordinary meaning of that word, and the Playhouse may be used for meetings, limited to three nights per week, of nonprofit groups.
PRESCRIPTION OF THE RIGHT TO ENFORCE OR ABANDONMENT OF THE COVENANTS:
Building restrictions may be enforced by mandatory and prohibitory injunctions. C.C. art. 779. No action for injunction or for damages on account of the violation of a building restriction may be brought after two years from the commencement of a noticeable violation. After the lapse of this period, the immovable on which the violation occurred is freed of the restriction that has been violated. C.C. art. 781. Building restrictions terminate by abandonment of the whole plan or by a general abandonment of a particular restriction. When the entire plan is abandoned the affected area is freed of all restrictions; when a particular restriction is abandoned, the affected area is freed of that restriction only. C.C. art. 782.
Defendants first raised the issue of prescription on appeal, alleging that the first noticeable violation of the covenants was in 1979 when the American Bankers Association (ABA) held functions at Longue Vue several nights in a row with hundreds of guests each night. Although an exception of prescription may first be raised on appeal, the court of appeal found the record not fully developed on the issue and refused to consider the exception. C.C.P. art. 2163.
Plaintiffs argue we should exercise our discretion and also refuse to address the issue of prescription. They contend the record was not fully developed on the issue because defendants failed to raise it at trial and argue it would be unfair to remand in light of the expense of further proceedings and the unavailability of two key witnesses. In a supplemental brief to this Court, plaintiffs argue that the covenants involved are really not building restrictions subject to a two-year prescriptive period but predial servitudes subject to a ten-year prescriptive period. However, for the following reasons we find it unnecessary to rule that the covenants are predial servitudes.[9]
*55 Although other functions have been held at Longue Vue, the record details only the 1979 ABA parties, the 1982 Loria party, the 1983 Moss wedding reception, the Pettit parties in 1984 and 1986, and the 32 functions in 1987. After the series of ABA parties, Murphy Moss and Max Nathan wrote a 1979 letter to Longue Vue at the request of the other residents complaining primarily about public use of Garden Lane. Similarly, the 1984 Diefenthal letter complained primarily of violations of the use of Garden Lane by guests and service persons attending a 1983 wedding. In addition, Moss, who is not a plaintiff, testified he complained about commotion created when filming was done at Longue Vue and on other occasions when he was disturbed by amplified music. All these complaints were made before Moss moved from Garden Lane in 1986; he claimed that Ms. Treadway was "very solicitous and always heard what we had to say and indicated she would do what she could." More recently, there is evidence Loria complained to Treadway about the increasing disturbance created by the functions at Longue Vue and was also assured that his concerns would be addressed.
An examination of the record shows that violations of the 1977 agreement have been regularly protested. Defendants' recurring assurances in response to this request constitute acknowledgment sufficient to interrupt prescription. C.C. art. 3464.[10] Suit was thus timely filed. Furthermore, given the continuous nature of the violations of the agreements, prescription could not have run.[11]
However, we still must consider whether plaintiffs have abandoned the covenants. The right to enforce a restrictive covenant or real right running with the land may be lost by waiver or relinquishment through acquiescence, due to the failure of the landowners in the tract or subdivision to protest and object to general and continuous violations of building restriction clauses and that thereafter they have no right to subsequently enforce the restrictions by injunction process or through the courts. Edwards, 3 So.2d at 665.
Defendants claim plaintiffs have acquiesced in Longue Vue's conduct and hence have abandoned any right to enforce the covenants insofar as they prohibit parties. They contend that even though the 1979 Moss letter and 1984 Diefenthal letter protest public use of Garden Lane, they make no mention of noise or other disturbance created by activities on the Longue Vue property. Further, they argue the parties hosted at Longue Vue by Garden Lane residents reflect not merely acquiescence but participation in activities *56 which the plaintiffs now contend are in violation of the covenants.
We note that although two of the plaintiffs hosted functions at Longue Vue, others have never attended a Longue Vue function or indeed set foot on the property. Witnesses for the plaintiffs testified without contradiction that the noise, frequency, and size of these functions increased in the two years prior to filing suit. The record shows that, in the first few years following the 1977 agreement, the most common complaints of the neighbors concerned violations on the ban of public use of Garden Lane. Any parties held at Longue Vue during this period did not create a disturbance and the plaintiffs acknowledge as much. However, the parties appear to have grown in frequency, duration, and level of activity, and the disturbance created has increased accordingly. The very fact that some of the residents gave parties at Longue Vue demonstrates that, at the time they did so, these functions had not yet become noticeably in violation of the covenants. As Pettit testified, it was not until late-night parties with loud music and noisy cleanup became frequent in 1987 that the disturbance became serious enough that litigation was considered. This testimony is supported by that of the other plaintiffs and their counsel who concede the plaintiffs never complained about daytime tours with box lunches.
In a previous case dealing with the abandonment of restrictive covenants, Guyton v. Yancey, 240 La. 794, 125 So.2d 365 (1961), we relied on the following principles. Whether there has been acquiescence sufficient to constitute abandonment depends on the circumstances of the case and the materiality of the breach.
Nonobjection to trivial or minor breaches of the covenant does not result in the loss of the right to enforce the covenant by injunction.
Notwithstanding acquiescence in other violations of a ... restriction, an owner of property will not be denied equitable relief to enforce it if the restriction can be shown to be of value to him and such breaches have not resulted in a subversion of the original scheme of development resulting in a substantial, if not an entire, change in the neighborhood.
Guyton, 125 So.2d at 368. Until the two years preceding trial, violations were infrequent and minor. There has been no subversion of the original scheme resulting in a change in the neighborhood. Nevertheless, since plaintiffs were undisturbed by at least some parties given at Longue Vue, they can be said to have acquiesced to the extent that defendants'"commercial activities" did not infringe on their peace.
It is well settled in the jurisprudence that in interpreting controversial clauses in a contract the court is guided by the interpretation the parties themselves placed upon the agreement as shown by their actions. Cashio v. Shoriak, 481 So.2d 1013, 1016 (La.1986). As we discuss below, this rule does not make the covenants unenforceable but does reveal why the trial judge attempted to reach some middle ground between the positions of the parties.
LONGUE VUE'S ACTIONS AND THE LAW OF NUISANCE:
Plaintiffs alleged in their complaint that Longue Vue's conduct constitutes a nuisance; the trial judge did not address that issue. Because plaintiffs neither appealed the trial court judgment nor answered Longue Vue's appeal, defendants argue plaintiffs waived the right to assert a nuisance claim. This argument is without merit. The trial court granted relief to the plaintiffs on other grounds; they were hence not obliged to answer defendants' appeal since they did not seek to have the judgment modified, revised or reversed in part. C.C.P. art. 2133. The claim that defendants' activities constitute a nuisance is therefore still viable.
The record makes clear that the focus of plaintiffs' complaints has been the loud parties with amplified music lasting until late in the night. Activities at Longue Vue have included large numbers of guests, amplified music from bands playing until late in the evening, caterers cleaning up until 2:00 a.m. and later, and the installation of portable toilets which are visible from Garden Lane and plaintiffs' properties. *57 It is not difficult to conclude that such activities, with any degree of regularity, within a stone's throw of residences would create a substantial disturbance.
In a recent construction of C.C. arts. 667-669 dealing with the laws of vicinage, Rodrigue v. Copeland, 475 So.2d 1071, 1078 (La.1985), we ordered injunctive relief because defendant's activities constituted "an unreasonable intrusion into the lives of his neighbors when considered in light of the character of the neighborhood, the degree of the intrusion and its effect on the use and enjoyment of their properties by his neighbors." That description applies equally to the situation before us and offers additional reason to enjoin at least some of defendants' activities.
In its application to the court of appeal and again in brief to this Court, Longue Vue offered to accommodate the plaintiffs by banning amplified music, imposing a 10 p.m. curfew for guests and an 11 p.m. curfew for caterers[12], and offering to erect a fence and plantings along the Garden Lane boundary. In view of Longue Vue's failure to abide by past assurances of cooperation, the plaintiffs are reluctant to accept commitments which are not contractually or judicially enforceable.
CONCLUSION
Considering all these factors, the trial court's declaratory judgment and injunction set out guidelines which strike a middle ground between the parties. Implicit in his ruling is the finding that plaintiffs have acquiesced in at least some of the commercial activities on defendants' property. Under the trial court's declaratory judgment guidelines, defendants were permitted to serve cold meals to the accompaniment of string music during longer hours than the museum and gardens have been opened. The trial court also recognized the validity of plaintiffs' complaints and perforce limited the number of guests who can be accommodated by barring use of portable toilets. In addition, all functions at Longue Vue were to cease by 6 p.m. This limitation would curtail the loud, late-night functions which have disturbed the neighborhood yet Longue Vue will be allowed to continue the type of activities which in the past neither disturbed the neighbors nor inspired protest. The stately Longue Vue residence may have been transformed into a museum, but it is nevertheless bound by and must recognize the constraints of its location.
For the reasons given, and because we do not find manifest error in the trial court judgment, we hereby reinstate its judgment as follows:
1) The "Playhouse" may only be used for meetings of the Longue Vue Management Corporation, Longue Vue Foundation, Longue Vue House and Gardens Advisory Corporation or of any group under its sponsorship such as Friends of Longue Vue for night meetings after 7:00 p.m. and then not to exceed three such meetings at night in any one week;
2) The "Main House" and outbuildings may be used as a museum only between the hours of 8:00 a.m. and 6:00 p.m.;
3) Longue Vue Gardens may be opened to the public between the hours of 8:00 a.m. through 6:00 p.m.;
4) The term "museum" does not include the concept of serving hot meals irrespective of whether the hot meals are prepared on premises or by outside caterers and then bussed in;
5) The operation of the gardens and museum does not include permitting bands or small groups of musicians other than strings such as violinists, harpists, or pianists;
6) The placing of portable toilets or temporary restroom facilities on the premises is prohibited except in those instances when construction work is being performed or in cases of emergency caused by other than the act of defendants in permitting a large number of people to be present on the premises at any one time.
*58 We also find that as recently as 1987 Longue Vue has violated the covenants by permitting the use of Garden Lane in connection with its functions, and we amend the trial court judgment to include a ban on usage of Garden Lane for public access to Longue Vue. The trial court's declaratory judgment is also amended to permit the Playhouse, which houses museum items, to be opened during the day for tours and other museum activities which we have found permissible, like strings and cold food. We further amend to allow defendants to continue operation of the gift shop and offices necessary to museum functions.
COURT OF APPEAL REVERSED. TRIAL COURT JUDGMENT REINSTATED AS AMENDED.
NOTES
[1] Four of the plaintiffs, the Monteleones and the Elms, are lessees. The remaining plaintiffs own Garden Lane property.
[2] The latter corporation's predecessor was defendant Longue Vue Management Corporation.
[3] Longue Vue contends Mrs. Stern took this position in spite of the fact that the 1931 Act had declared "Metairie Lane [as Garden Lane was then called] is a common alley, never dedicated to public use, appurtenant to all the properties" located thereon.
[4] A driveway and an entrance gate on Garden Lane continue to provide access to Longue Vue; however, use of the lane is restricted to the use and benefit which is "accessory to the use of said [Garden Lane] properties as private residences of the owners."
[5] Longue Vue called as a witness former Garden Lane resident Murphy Moss, a signatory to the 1977 agreement, who held a wedding reception for his son at Longue Vue in 1983. At the time of this party, Moss did not advert to the agreement but now believes the party was in violation. Plaintiff Phillip Loria purchased his property after the 1977 agreement was signed and, at the time he gave his daughter's debutante party at Longue Vue in December 1982, was unaware of the document's existence. Mr. and Mrs. Robert Pettit attended the Loria party and Mr. Pettit, who is not a plaintiff to this suit, has hosted two functions at Longue Vue, a surprise birthday party for Mrs. Pettit in 1984 and a debutante party for their daughter in November of 1986.
[6] The law concerning building restrictions is presently codified at C.C. arts. 775 to 783. According to the official comments, these 1977 code articles did not change the prior law. The 1931 agreement not only barred commercial use of Garden Lane property but also restricted lot size as well as building size, type, and location. Even though that agreement was binding for a term of 50 years, its terms were renewed by incorporation into the 1977 agreement.
[7] Dixie Campers relied on C.C. art. 2276, an article which was repealed by the 1984 adoption of C.C. art. 1848. Comment (a) makes clear art. 1848 did not change the law.
[8] Doubt as to the existence, validity, or extent of building restrictions is resolved in favor of the unrestricted use of the immovable. C.C. art. 783.
[9] Building restrictions are incorporeal immovables and real rights likened to predial servitudes. They are regulated by application of the rules governing predial servitudes to the extent that their application is compatible with the nature of building restrictions. C.C. art. 777. As comment (d) to that article observes, "The matter of classification of building restrictions has given rise to analytical difficulties in Louisiana." We find it doubtful, however, that these covenants would be classed as servitudes: "Man's activities are not the subject of predial servitudes, for it is an estate and not man which is subservient to a servitude." Reymond v. State, Department of Highways, 255 La. 425, 231 So.2d 375, 382 (1970).
[10] Prescription is interrupted when one acknowledges the right of the person against whom he had commenced to prescribe. C.C. art. 3464. As explained in comment (d), this article served to legislatively overrule dicta in Goldsmith v. McCoy, 190 La. 320, 182 So. 519 (1938), which declared that only the prescription of nonuse running against continuous and apparent servitudes could be interrupted by tacit or informal acknowledgment. Thus art. 3464 represents a return to traditional concepts, in accord with the spirit of recent legislation dealing with servitudes. The longstanding rule, with which until Goldsmith Louisiana courts were in accord, is that an acknowledgment interrupting the prescription of nonuse can be express or tacit, written or oral, and formal or informal. C.C. art. 3464, comment (d); Gillis & Co. v. Nelson and Donalson, 16 La.Ann. 27 (1861).
[11] The question of prescription might be significant if this were an action for damages. Cf. South Central Bell Telephone v. Texaco, Inc., 418 So.2d 531, 533 (La.1982). Plaintiffs sought damages and injunctive relief. Prior to trial, the issue of damages was deferred pending a ruling on the suit for injunction. In brief to this Court, plaintiffs have said they no longer seek damages.
[12] At the court of appeal, the proposed curfews were 11 p.m. for guests and midnight for caterers.