923 So.2d 45 (2005)
PARISH OF EAST FELICIANA through EAST FELICIANA PARISH POLICE JURY
v.
Jeremy Michael GUIDRY, Amber Michelle Guidry, Individually and Jeremy Guidry d/b/a Midway Motocross.
No. 2004 CA 1197.
Court of Appeal of Louisiana, First Circuit.
August 10, 2005.
*46 James L. Pate, Jason T. Reed, Lafayette, Michael L. Hughes, St. Francisville, Counsel for Plaintiff/Appellee Parish of East Feliciana and East Feliciana Parish Police Jury.
Michael O. Hesse, St. Francisville, Counsel for Intervenors/Appellees Brian Beauvais, et al.
Spencer H. Calahan, P. Charles Calahan, Baton Rouge, Counsel for Defendants/Appellants Jeremy Michael Guidry, et al.
Before: PARRO, GAIDRY, and McCLENDON, JJ.
MCCLENDON, J.
Defendants appeal a trial court judgment enjoining them from operating a motocross track on their property based on the finding that such activities constitute a *47 nuisance. For the reasons that follow, we affirm.

FACTUAL AND PROCEDURAL HISTORY
In 1997, Jeremy Guidry constructed a motocross track on his property in East Feliciana Parish ("Parish") for recreational use. Approximately one year later, he began to construct a larger track on his property. Mr. Guidry, who was employed by the sheriff's department and owned a trucking company, decided to operate this larger track as a commercial venture under the name, Midway Motocross. It opened for business on November 5 or 6, 1999. Later that month, Mr. Guidry and Midway Motocross were cited by the Parish Police Jury for violating the Parish's nuisance ordinance. In December of 1999, several of Mr. Guidry's neighbors wrote letters to Parish authorities complaining about the noise and dust generated by the motocross operation. Thereafter, the Parish Police Jury adopted a noise ordinance on April 18, 2000.
On May 25, 2000, the Parish filed a "Petition for Preliminary and Permanent Injunction" seeking to enjoin Jeremy and Amber Guidry from operating the Midway Motocross track on their property. It alleged that the dust, noise, and fumes generated by the operation of the track caused "serious and material discomfort to certain inhabitants of East Feliciana Parish and in particular those persons living on and/or owning property in proximity to the Guidry property." The Parish claimed that the Guidrys' motocross activities were a violation of both its nuisance ordinance and its noise ordinance and thus constituted a public nuisance per se. Thereafter, on June 21, 2000, various persons owning property surrounding the Guidrys' property filed a "Petition for Intervention" seeking to enjoin the motocross operation, alleging that it was a nuisance pursuant to La. C.C. arts. 667 and 669.
A hearing on the preliminary injunction was held on July 10, 2000. After hearing testimony and receiving evidence, the trial court granted the preliminary injunction and judgment was signed accordingly on July 24, 2000. No appeal was taken from this preliminary injunction.
In April of 2002, the intervenors filed a motion requesting a trial date on the permanent injunction. Soon after, the defendants filed a motion seeking to dissolve the preliminary injunction. The trial on the plaintiff's and intervenors' demand for a permanent injunction as well as the defendants' motion to dissolve the preliminary injunction began on July 24, 2002 and was continued until July 30, 2003. At trial, the record from the preliminary injunction hearing was filed into evidence and new testimony and evidence was adduced. A summation of pertinent testimony from both proceedings is as follows.
Jeremy Guidry testified that when he first opened the track for business, he operated seven days a week from 9:00 a.m. until dark. Thereafter, he restricted the days of commercial operation to Thursday (12:00 p.m. until dark), Friday, Saturday and Sunday (10:00 a.m. until dark) with only recreational riding taking place on Monday, Tuesday, and Wednesday. The track began conducting races in July 2000. Only one race was held before the preliminary injunction went into effect. Approximately 100 motorcycles were entered in the race with 15 bikes racing per heat. He stated that once racing had begun, he would probably only operate the track every other weekend. He testified that on a non-racing weekend approximately 10 to 12 motorcycles would ride on the track with a fewer number using the track on weekdays. In an effort to reduce the noise generated by the track activity, he *48 planted two rows of pine saplings eight feet apart and offered to construct an eight-foot wooden fence. He also installed a sprinkler system to help keep the amount of dust down.
Intervenor, Joe Brown, owns the property next to Jeremy Guidry. He stated that he bought the property because of its rural, tranquil setting. It was his dream that he and his two daughters could each build their homes on the property. The area of his property that would be most suitable for building his home is adjacent to the Guidrys' track. However, he refuses to build his home until he knows that the track will not be allowed to operate. Although he had no problem with the recreational riding that took place on the Guidrys' property, he stated that there was a tremendous difference in the level of activity once the track became commercial. At the time of trial, Mr. Brown used the property for cattle farming and recreational purposes. However, while the track was operating he was unable to enjoy either hunting or fishing and had to limit the amount of time he stayed on the property. He stated that the noise generated by the track was "loud and irritating" and "sheerly aggravating." He described it as "a constant roar, almost like a deliberate aggravation,... a[n] up and down constant roar, continuous, one after another." He averred that he was a person of normal health and agreed that the noise caused him emotional aggravation and stress.
Intervenor, Dennis Berthelot, owns the property next to Joe Brown. He testified that the noise on his property was about the same level as the noise on Mr. Brown's property. At the time of the preliminary injunction hearing, he and his wife were living in a trailer on their property. However, he subsequently built a home there prior to trial. He stated that while the track was operating, there was continuous motorcycle riding every day from 7:00 or 7:30 a.m. until dark. He could hear the noise from the track inside his trailer. He stated that the noise from the motorcycles was a "continuous revs of engines that, that go up to over eighty-five decibels down to zero and back up again continuously.... It's like a bumblebee in your ear that never goes away." He said that due to the noise he could not sit outside in the afternoons, fish in his pond, or deer hunt. He testified that he had to wear a Walkman or earplugs just to work in his garden. He and his family would leave their home on Sundays to escape the noise. If the track is permitted to operate, he stated that he would not be able to live in his home. He claimed that the noise from the track was unbearable. Although he is a person of normal health and sensibilities, he maintained that the noise made him stressed and irritable and that he suffered stomach problems due to the stress.
Mr. Berthelot also claimed that he suffered due to the dust generated by the track. He maintained that the air was full of dust, which he did not want to breathe. He claimed that if the wind was blowing in his direction, everything in his yard would become covered with dust.
Mr. Berthelot's wife, Dena, also an intervenor, stated that she could live with the dust, however, she maintained that the noise was a nuisance. She claimed that they moved to the country for peace and quiet, but the noise they experienced from the track was nerve-racking and made her irritable. She claimed that she could hear the noise inside her trailer with the air conditioner and television running on some afternoons. However, she asserted that it was the noise outside that was truly intolerable. She claimed that it was the nature of the noise, not its level, that was frustrating. She said it was like having 50 chainsaws constantly running. She took a video *49 on her property to document the noise, however, she testified that the noise recorded on the video is not nearly as loud as it is in "real life." She claimed that if the track is allowed to operate, even recreationally, she would be unable to live on her property.
The Berthelots' son, Steven, is also an intervenor. At the time the preliminary injunction hearing took place, he owned a home on a portion of his father's property that had been donated to him. While the preliminary injunction was in effect, he took the opportunity to sell his home so that he could get the most value for it. When the trial for the permanent injunction was held, he was living in an apartment on the back of his father's home. He testified that the noise from the track was unbearable and that the dust was unbelievable. He maintained that he could hear the noise in his home even with the air conditioner and television running and that it was an aggravation. He claimed that the noise started early in the morning and continued until dusk. On some days, it continued for twelve or fourteen hours. Steven claimed that he could not watch television in his bedroom or barbecue in his backyard due to the noise.
Intervenor, George Remmetter, owns property approximately 1,500 to 2,000 feet away from the Guidrys' property. He testified that he bought his property in 1991 so that he could retire in peace and quiet. He stated that he heard "very, very loud noises" from the track that he described as "miserably, miserably annoying." He claimed that the noise caused him a great deal of stress and made both him and his wife irritable. He maintained that only when the wind was blowing directly away from his home was the noise tolerable. Otherwise, the noise was as bad as that experienced by the Berthelots on their property, and when the wind was blowing in his direction, it was even worse. He claimed that the noise restricted his outdoor activities such as deer hunting. He could not stay on his deer stand any longer than fifteen minutes due to the extreme noise. He averred that he would not be able to live on his property if the track is allowed to operate, but he fears the track will impact the value of his land because no one would want to live there.
Intervenor, Noelle Prescott, and several of her family members own a home on 135 acres near the Guidrys' property. They use it primarily as a retreat and for family gatherings. She described the noise from the track as a "constant buzz," "it will get loud and then it will drop...kind of like a dentist drill, it's more than noise, it's just this really persistent constant noise." She said that she can hear the noise inside the house, and that outside, it interferes with conversation. She stated that she and her family quit going to the property altogether because they could not relax outside, take nature walks, or fish in the pond due to the noise from the track.
Reverend Rufus Branch, also an intervenor, owns property approximately 750 feet from the Guidrys' property boundary. He stated that he could hear the noise from the track inside his home. He described the noise from the track as horrible and "very irritating" but stated that he considered the dust it generated a bigger problem. If the track is allowed to operate, he will continue to live on his property due to his age, however, he would have to wear earplugs.
Steve Verret was accepted by the court as an expert in the field of industrial hygiene, which includes the measurement of sound. On April 2, 2000, he took sound level readings at thirteen locations along Joe Brown's and Dennis Berthelot's property boundaries using a Quest Model 215 Sound Level Meter. His report based on *50 those readings was admitted into evidence. The report explained that the "numbers of operating motorcycles varied during the monitoring period from as few as one to as many as five to seven." Dennis and Steven Berthelot's testimony established that on the day the readings were taken, the activity and noise from the track was less than usual. Mr. Verret's report further stated that the noises were variable in loudness, in some cases reaching beyond the range of the Quest microphone. In those cases, he noted, "the highest noise level may not have been recorded."
Mr. Verret reported that the average readings taken from seven locations along the Berthelots' property boundary ranged from a low of 45 to a high of 58 decibels, while the maximum readings at those locations ranged from a low of 54 to a high of 69 decibels. The average readings taken at six locations along Mr. Brown's boundary ranged from a low of 55 to a high of 66 decibels, while the maximum levels recorded at these locations ranged from a low of 68 to a high of 85 decibels. He testified that the variations in readings were due to the character of the motocross noise, which constantly fluctuates up and down. He further testified that for every increase of 3 decibels, there is a doubling of the sound power level or noise. Therefore, the noise levels doubled more than seven times during the taking of the noise measurements.
At trial, Mr. Verret referred to recommendations published by the Environmental Protection Agency (EPA.) According to the EPA, when decibel readings register in the mid-50's there is a slight disturbance of normal voice or relaxed conversation with 100% sentence intelligibility at about a foot. Approximately 4% of the population will be annoyed at this level. At 60 decibels, there is a moderate disturbance of normal voice or relaxed conversation at about the one-foot range. Depending on the attitude and other factors, approximately 9% of the population will be annoyed or highly annoyed by that noise level. The average community reaction, that would be the number of complaints that the sheriff's department might get, is considered slight to moderate. According to the EPA, noise may be considered an adverse aspect of the community environment at the 60-decibel level. At 65 decibels, there would be a significant disturbance of normal voice or relaxed outdoor conversation at one-tenth of a meter distance. Approximately 15% of the population would be highly annoyed by that level and the community reaction would be significant. Noise then becomes one of the most important adverse aspects of the community environment. At 70 decibels, there is significant disturbance of normal outdoor speech. At this level, about 25% of the population would be highly annoyed and the community reaction is ranked as severe. According to the EPA, this is eight decibels above significant complaints and threats of legal action. At 75 decibels, the EPA says that hearing loss may begin to occur in sensitive individuals. With outdoor speech, there is a very significant disturbance of normal voice or relaxed conversation and 37% of the population would be highly annoyed. Community reaction is ranked as very severe. Noise is likely to be the most important of all adverse aspects to the community. The EPA recommendations did not consider anything beyond 75 decibels, but Mr. Verret stated that the adverse effects would increase concomitantly with an increase in decibels.
In his opinion, the noise level readings that he measured for his report would constitute an aggravation and a nuisance to persons of ordinary sensibilities. He stated that noise levels can affect blood pressure and cause nervous conditions and stress.
*51 Mr. Verret discounted the sound barriers proposed by Mr. Guidry. He opined that an eight-foot fence would not be an effective barrier considering the waveform of sound and the height of the jumps on the track. As for Mr. Guidry's proposal to plant trees, he stated that it would require acres of trees, i.e., a veritable forest, before any reasonable amount of attenuation could be achieved.
Following the trial, the court took the issue of the permanent injunction under advisement. However, it denied the Guidrys' motion to dissolve the preliminary injunction. Thus, the preliminary injunction remained in effect pending a decision on the permanent injunction.
On August 27, 2003, the trial court issued written reasons for judgment. Therein, it concluded that the activities of the defendants constituted a nuisance that substantially interfered with the intervenors' enjoyment of their property and therefore must be enjoined. This ruling was memorialized in a judgment signed on September 24, 2003. From this judgment, defendants devolutively appeal. Defendants essentially argue that the trial court erred in finding that its track activities were a nuisance, because such a finding was not supported by facts that were clear and convincing.

APPLICABLE LAW
At the outset, we note that the intervenors, as neighboring property owners, requested injunctive relief based upon La. C.C. arts. 667 and 669. The Parish never alleged that it was a neighboring property owner. Rather, the basis for its request for injunctive relief was the violation of its "Noise Ordinance (Part II, Chapter 10[,] Article VI, Section 10-80 et seq.) and ... Nuisance Ordinance (Part II, Chapter 10, Article V, Section 10-71 et seq.) of the Code of Ordinances of East Feliciana Parish." Importantly, Section 10-71 of the Parish's Nuisance Ordinance expressly states that "[a]s used in this article, the term "nuisance" shall refer to the prohibitions contained in Articles 664 through 674 of the Louisiana Civil Code." Moreover, when there are several laws on the same subject matter, they must be interpreted in reference to each other. Thus, local nuisance ordinances must be construed in reference to the applicable civil code provisions. See Hernandez v. Richard, 2000-471, pp. 6-7 (La.App. 3rd Cir. 12/6/00), 772 So.2d 994, 997-98. Accordingly, we now examine the pertinent civil code articles.
The corresponding rights and obligations of neighboring proprietors are principally governed by La. C.C. arts. 667-669. Inabnet v. Exxon Corporation, 93-0681 (La.9/6/94), 642 So.2d 1243, 1250. These articles provide, in pertinent part:
Art. 667. Although a proprietor may do with his estate whatever he pleases, still he cannot make any work on it, which may deprive his neighbor of the liberty of enjoying his own, or which may be the cause of any damage to him.
Art. 668. Although one be not at liberty to make any work by which his neighbor's buildings may be damaged, yet every one has the liberty of doing on his own ground whatsoever he pleases, although it should occasion some inconvenience to his neighbor.
Thus he who is not subject to any servitude originating from a particular agreement in that respect, may raise his house as high as he pleases, although by such elevation he should darken the lights of his neighbors's [neighbor's] house, because this act occasions only an inconvenience, but not a real damage.
Art. 669. If the works or materials for any manufactory or other operation, *52 cause an inconvenience to those in the same or in the neighboring houses, by diffusing smoke or nauseous smell, and there be no servitude established by which they are regulated, their sufferance must be determined by the rules of the police, or the customs of the place.
These articles place limitations on the rights of owners by setting out principles of responsibility that require an owner to use his property in such a manner as not to injure another. Louisiana Civil Code article 667 prohibits uses that cause damage to neighbors or deprive them of the enjoyment of their property, while La. C.C. art. 668 permits uses that merely cause neighbors some inconvenience. Louisiana Civil Code article 669 allows suppression of certain inconveniences if excessive under local ordinances or customs, and requires tolerance of lesser inconveniences. Together the three articles establish the following principles: (1) no one may use his property so as to cause damage to another or to interfere substantially with the enjoyment of another's property; (2) landowners must necessarily be exposed to some inconveniences arising from the normal exercise of the right of ownership by a neighbor; and (3) excessive inconveniences caused by the emission of industrial smoke, odors, noise, dust vapors, and the like need not be tolerated in the absence of a conventional servitude. Whether an inconvenience is excessive or not is to be determined in the light of local ordinances and customs. Inabnet, 642 So.2d at 1250-51; Barrett v. T.L. James & Co., 28,170, pp. 5-6 (La.App. 2nd Cir.4/3/96), 671 So.2d 1186, 1190-91, writ denied, 96-1124 (La.6/7/96), 674 So.2d 973.
The obligations of vicinage contained in articles 667-669 are legal servitudes imposed on the owner of property. These provisions embody a balancing of rights and obligations associated with the ownership of immovables. As a general rule, the landowner is free to exercise his rights of ownership in any manner he sees fit. He may even use his property in ways which occasion some inconvenience to his neighbor. However, his extensive rights do not allow him to do real damage to his neighbor. Rodrigue v. Copeland, 475 So.2d 1071, 1077 (La.1985).
Thus, the owner of property has a right to conduct thereon any lawful business not per se a nuisance, as long as the business is so conducted that it will not unreasonably inconvenience a neighbor in the reasonable enjoyment of his property. But every business, however lawful, must be conducted with due regard to the rights of others, and no one has a right to erect and maintain a nuisance to the injury of his neighbor even in the pursuit of a lawful trade, or to conduct a business on his own land in such a way as will be injurious or offensive to those residing in the vicinity. Hilliard v. Shuff, 260 La. 384, 256 So.2d 127, 129 (1971), citing Devoke v. Yazoo & M.V.R. Co., 211 La. 729, 30 So.2d 816 (1947).
Hence, this court must determine whether the motocross operation is the type of inconvenience that neighboring proprietors must tolerate or whether it causes real damage to those neighboring proprietors and their right to enjoy their own premises. The extent of the inconvenience a property owner must tolerate without redress depends on the circumstances. Barrett, 28,170 at p. 6, 671 So.2d at 1191. This analysis requires consideration of factors such as the character of the locality, the nature and degree of the intrusion, and the effect of the activity on the health and safety of the neighbors. Rodrigue, 475 So.2d at 1077.
In Robichaux v. Huppenbauer, 258 La. 139, 245 So.2d 385, 389 (1971), our supreme *53 court stated that noxious smells, rats, flies and noise may constitute an actionable nuisance although produced and carried on by a lawful business, where they result in material injury to neighboring property or interfere with its comfortable use and enjoyment by persons of ordinary sensibilities. This test has also been applied by this court. In McCastle v. Rollins Environmental Services of Louisiana, Inc., 415 So.2d 515, 519 (La.App. 1st Cir.), writ denied, 420 So.2d 449 (La. 1982), this court stated that the test of the right to an injunction against the maintenance of a nuisance is whether the alleged nuisance produces serious or material discomfort to persons of ordinary sensibilities in a normal state of health. In two of its more recent pronouncements, the supreme court granted injunctive relief because a defendant's activities constituted an unreasonable intrusion into the lives of his neighbors when considered in light of the character of the neighborhood, the degree of the intrusion and its effect on the use and enjoyment of their properties by his neighbors. Diefenthal v. Longue Vue Management Corp. 561 So.2d 44, 57 (La. 1990); Rodrigue, 475 So.2d at 1078.
To obtain injunctive relief under La. C.C. arts. 667-669, a party must prove irreparable injury under La. C.C.P. art. 3601 in addition to the necessary showing of real damage.[1]Rodrigue, 475 So.2d at 1078; Salter v. B.W.S. Corp., Inc., 290 So.2d 821, 824-25 (La.1974); Day v. Warren, 524 So.2d 1383, 1386 (La.App. 1st Cir.1988). The issuance of a permanent injunction under La. C.C.P. art. 3601 takes place only after a trial on the merits in which the burden of proof is a preponderance of the evidence.[2]Mary Moe, L.L.C. v. Louisiana Board of Ethics, 2003-2220, p. 9 (La.4/14/04), 875 So.2d 22, 29; Hughes v. Muckelroy, 97-0618 (La.App. 1st Cir.9/23/97), 700 So.2d 995, 998.
The manifest error standard is the appropriate standard of review for the issuance of a permanent injunction, as well as a trial court's factual determination of whether an activity constitutes a nuisance. Mary Moe, 2003-2220 at p. 9, 875 So.2d at 29; Barrett, 28,170 at p. 6, 671 So.2d at 1191. Under this standard, in order to reverse a trial court's determination of a fact, an appellate court must review the record in its entirety and find that a reasonable factual basis does not exist for the finding, and further determine that the record establishes that the fact finder is clearly wrong or manifestly erroneous. Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880, 882 (La. 1993). Thus, if the trial court's findings are reasonable in light of the record reviewed in its entirety, this court may not reverse, even if convinced that had it been sitting as trier of fact, it would have weighed the evidence differently.

*54 ANALYSIS
With the foregoing precepts in mind, we find that the record herein provides a reasonable factual basis for the trial court's determination that the motocross operation has occasioned real damage, not mere inconvenience, upon the intervenors. Likewise, we conclude the record supports a finding that the intervenors will be irreparably harmed unless injunctive relief is granted. The defendants' motocross activities constitute "an unreasonable intrusion into the lives of [their] neighbors when considered in the light of the character of the neighborhood, the degree of intrusion and its effect on the use and enjoyment of their properties by [those] neighbors." Rodrigue, 475 So.2d at 1078.
The record demonstrates that the affected area is a rural locale. Most of the intervenors testified that they bought property there in order to escape the city and enjoy the peace and quiet of country living. Many of them live on their property and actively pursue outdoor activities such as fishing, hunting, and gardening.
Mr. Verret testified that the ambient noise level for a rural community of this nature would be much lower than that of an urban community. He opined that the ambient noise level for the area at issue would probably be 35 to 45 decibels. He explained that an area with such a low ambient noise level would respond greatly to the introduction of an additional 10-decibel source into that community. However, the same 10 decibels would not have as much of an impact in an urban environment that had a higher ambient noise level. Because the community threshold was low, he stated that the noise produced by the track created a more significant intrusion.
The record indicates that the degree of this intrusion was extensive. Many of the intervenors testified that they could hear the noise within their homes and all of them stated that they were subjected to the noise outside. Mr. Verret took readings that reached a maximum of 85 decibels. However, he noted that some of the noise reached beyond the range of his microphone, thus he was unable to record any higher readings. Moreover, on the day the readings were taken, the number of operating motorcycles was less than usual. Had more motorcycles been operating, the sound levels would have measured even higher. Considering these facts, we note that the readings taken by Mr. Verret, in conjunction with the recommendations published by the EPA, support a finding that the level of noise normally generated by the track constituted an unreasonable intrusion into the lives of the intervenors.
Additionally, we find that the degree of the intrusion is not merely an issue of the level of the noise. We also find relevant the nature of the noise, as well as its persistence and duration. Many of the intervenors noted that the fluctuating character of the noise, which was likened to a chainsaw or dentist drill or buzzing bee, was particularly stressful. The intervenors further testified that the noise was constant and that it continued from the early morning hours until nightfall.
All of the intervenors testified that they were people of normal health and sensibilities. However, they maintained that the noise produced by the track made them stressed and irritable. Dennis Berthelot testified that he actually suffered stomach pains due to the stress. The intervenors claimed that they were unable to enjoy their property due to the noise from the track and many stated that they would not be able to live there if the track is allowed to operate.
*55 Finally, Mr. Verret cast grave doubt on the effectiveness of Mr. Guidry's proposed sound barriers. While we recognize that Mr. Guidry did plant two rows of pine saplings, the evidence demonstrates this is woefully short of the forest of trees needed to achieve an appreciable amount of attenuation. Therefore, considering the foregoing, we cannot say that the trial court was clearly wrong in finding that the operation of the track occasioned real damage to the intervenors and that they were entitled to injunctive relief.

DECREE
Accordingly, the judgment of the trial court enjoining defendants, Jeremy Guidry, Amber Guidry, and Jeremy Guidry d/b/a Midway Motocross, from operating a motocross track and related activities on their property and from creating or allowing others to create unreasonably excessive noise or dust by riding unmuffled or insufficiently muffled vehicles on their property is hereby affirmed. All costs of this appeal are assessed to defendants, Jeremy and Amber Guidry.
AFFIRMED.
GAIDRY, J., concurs in part and dissents in part and assigns reasons.
GAIDRY, J., concurring in part and dissenting in part.
I concur in part and dissent in part from the majority opinion. While I agree that the plaintiffs are entitled to some injunctive relief, I do not agree with the imposition of a complete injunction totally prohibiting all moto cross activity. Injunction is an equitable remedy and should be carefully designed to achieve the essential correction at the least possible cost and inconvenience to the defendant. Hilliard v. Shuff, 260 La. 384, 256 So.2d 127, 129 (1972). Other surrounding proprietors engage in various commercial and recreational activities on their property (such as running a dirt business or cutting hay or hunting) that, while not causing real damages, nonetheless occasion some inconvenience to their neighbors. I believe that the moto cross operation could likewise be conducted in such a manner. Accordingly, I believe that the injunction should have been modified to limit the number of days per month and the number of hours per day that the track could operate such that it would only cause the surrounding proprietors, at most, some inconvenience, rather than real damage. In my opinion, such a modified injunction would be the only way to strike a "fair balance" between the competing interests of these parties. See Diefenthal v. Longue Vue Management Corp., 561 So.2d 44, 57 (La.1990). Therefore, I dissent from the majority opinion insofar as it affirms a total injunction prohibiting all moto cross activity. In all other respects, I concur.
NOTES
[1] We recognize that a party seeking an injunction need not prove irreparable harm when the threatened action is in direct violation of a prohibitory law. Paradigm Insurance Company v. Louisiana Patient's Compensation Fund Oversight Board, 95-1727, p. 4 (La.App. 1st Cir.9/27/96), 680 So.2d 783, 785. However, because the Parish's ordinances are analogous to the cited civil code provisions and because we find that intervenors have made a showing of irreparable harm, we decline to address this exception.
[2] Defendants rely on Hobson v. Walker, 41 So.2d 789 (La.App. 2nd Cir.1949), to support their contention that the burden of proof is clear and convincing evidence. However, Hobson cites no authority for this proposition. Moreover, subsequent to Hobson, our supreme court held in Salter and Rodrigue that the action for an injunction under La. C.C. arts. 667-669 is controlled by La. C.C.P. art. 3601. It is well established that the burden of proof for a permanent injunction under La. C.C.P. art. 3601 is a preponderance of the evidence.