700 So.2d 995 (1997)
Stanley B. HUGHES
v.
Sylvester MUCKELROY, In His Capacity as the Mayor of the City of New Roads; and the City of New Roads.
No. 97 CA 0618.
Court of Appeal of Louisiana, First Circuit.
September 23, 1997.
*996 David C. Vidrine, Baton Rouge, for Plaintiff/Appellee Stanley B. Hughes.
H. Alston Johnson, III, Baton Rouge, John Wayne Jewell, City Attorney, Donald J. Cazayoux, Jr., of counsel, New Roads, for Defendants/Appellants Sylvester Muckelroy, Mayor of the City of New Roads and The City of New Roads.
Before FOIL, WHIPPLE and KUHN, JJ.
KUHN, Judge.
This appeal involves a dispute regarding the terms of an employment contract. Plaintiff-appellee, Stanley B. Hughes, while serving as Chief of Police for the City of New Roads ("the City"), filed suit against defendants-appellants, the City and Sylvester Muckelroy, in his capacity as the Mayor of the City ("the Mayor"). Hughes sought injunctive relief when he learned that the Mayor intended to recommend to the City Council ("the Council") that Hughes' employment *997 with the City be terminated. The trial court issued a permanent injunction enjoining the defendants from terminating Hughes' employment "without sufficient cause through December 31, 1998." The sole issue on appeal is whether the trial court properly granted the injunction; the parties dispute whether Hughes was hired for a specified period of time. We find the trial court erred in granting the injunction and hereby vacate it.

FACTS AND PROCEDURAL BACKGROUND
During the latter part of 1993, Mr. Wiley McCormick was hired by the City to examine the police department, conduct an independent review of its operations, and render a report regarding recommendations for change within the department. McCormick's report advised that a change in leadership would be beneficial to the department. Based upon the report, the Council authorized the Mayor to advertise to attract applicants for the position of chief of police for the city. The selection committee reviewed the resumes of numerous applicants. When the potential candidates were narrowed to four, they were interviewed by the Mayor and Mr. Charlie Bonnette, who served as a councilman and Mayor pro tempore for the City. Ultimately, the Mayor recommended to the Council that Hughes be hired to fill the position.
On February 21, 1994, the Council adopted a resolution approving the Mayor's appointment of Hughes as chief of police. By letter dated February 22, 1994, the Mayor extended an offer of employment to Hughes for "the position of Chief of Police, at a [sic] annual salary of $32,000.00. [sic] plus benefits beginning, March 14, 1994." The letter also included a written acceptance signed by Hughes on February 28, 1994, which stated:
I, Stanley B. Hughes, accept the position of Chief of Police with the City of New Roads at an annual salary of $32,000.00 plus benefits. My official employment date will be March 14, 1994.
Hughes began his employment for the City as scheduled. During December of 1994, Hughes approached Mr. John Wayne Jewell, the City's attorney, and asked him to review and approve a proposed Contract of Employment, which an attorney had prepared for Hughes. The contract specified, in part:
[Hughes] shall serve ... as Chief of Police. The term of service shall be for a period of five (5) years, commencing on March 14, 1994, and shall expire on the 14th day of March, 1999. [Hughes] reserves the right to exercise the option of automatic five year renewal of this contract at his sole discretion.
According to Hughes, he was advised by Jewell that certain revisions would have to be made to the contract before it could be submitted to the Council. Hughes explained that when he initially applied for the position, he had spoken to McCormick, who had advised him the length of service was to be a five year period. Hughes recalled that Jewell pointed out that a five-year term of employment was not feasible because such a term would have extended past the Mayor's term in office by approximately three months. A second draft of the Contract of Employment was prepared, which stated in pertinent part that "the term of the Chief [of police] shall expire at the end of the term of office for the Mayor on the 31st day of December, 1998." Hughes represented that Jewell informed him that the contract should be acceptable and that he would present it to the Mayor.
On March 15, 1995, Hughes signed an acknowledgment form which was distributed to City employees along with employee handbooks. The acknowledgment form contains the following language:
I have entered into my employment relationship with the City of New Roads voluntarily and acknowledge that there is no specified length of employment. Accordingly, either I or the City of New Roads can terminate the relationship at will, with or without cause, at any time.. [sic]
During a Council meeting held on May 16, 1995, the Mayor submitted the second draft of the Contract Of Employment to the Council. In presenting the contract, the Mayor stated, "I think [the contract] would be in conflict with your policy in your Handbook, *998 the hiring policy...." In response, one of the Councilmen, Mr. Garrett, stated, "If we give a contract to Chief Stan Hughes, we have to give one to every other Department Head, and I think  we can't give it unless we give everyone else one, and then it throws off our whole salary matrix with the annual increase." A motion by one of the councilmen that the City not execute the contract was unanimously carried.
Following the May 1995 council meeting, Hughes continued to serve as chief of police. On August 27, 1996, Hughes' counsel was notified by letter that a special meeting of the Mayor and the Council had been set for August 29, 1996. The Mayor's intended recommendation to the Council that Hughes' employment be terminated was among the agenda items to be addressed during the meeting.
Hughes filed a petition seeking a temporary restraining order and a preliminary injunction directed to the Mayor and the City restraining the Mayor and the City and their agents and employees from terminating and/or scheduling or approving the termination of the plaintiff's contract of employment as the chief of police for the City. Hughes also prayed that a judgment be rendered perpetuating the preliminary injunction. In the petition, Hughes alleged that he and the Mayor had discussed the terms and conditions of his employment contract. According to the terms of the contract, Hughes would be required to retire from his current employment with the Louisiana State Police and relocate his residence to the Parish of Pointe Coupe. In consideration for these actions, Hughes asserted the Mayor offered him an employment contract which would be "equal in duration with the [Mayor's] current term of office which is to expire on December 31, 1998." Hughes asserted that although he has faithfully performed all of his employment obligations and that his job performance has been excellent, he was advised by the Mayor and Jewell that his employment was being terminated "without cause."
After a trial on the merits, the trial court issued a permanent injunction enjoining the defendants from terminating Hughes' employment "as the Chief of Police for the [City] without sufficient cause through December 31, 1998." The defendants have appealed, contending the trial court erred 1) in refusing to recognize that Hughes was an "at will" employee of the City, and 2) in holding that a quasi-contract existed between the City and Hughes.

ANALYSIS
La. C.C.P. art. 3601 provides, "An injunction shall issue in cases where irreparable injury, loss, or damage may otherwise result to the applicant, or in other cases specifically provided by law...." It is not necessary to show irreparable injury, however, when the act complained of is unlawful. Camp, Dresser & McKee, Inc. v. Steimle and Associates, Inc., 94-547, p. 5 (La.App. 5th Cir. 2/15/95); 652 So.2d 44, 47. The issuance of a permanent injunction takes place only after a trial on the merits, in which the burden of proof must be founded on a preponderance of the evidence, rather than a prima facie showing. Bollinger Machine Shop and Shipyard, Inc. v. U.S. Marine, Inc., 595 So.2d 756, 758 (La.App. 4th Cir.); writ denied, 600 So.2d 643 (La.1992); Picard v. Choplin, 306 So.2d 918, 919 (La.App. 3d Cir.1975); State Board of Education v. Anthony, 289 So.2d 279, 283 (La.App. 1st Cir. 1973), writs denied, 292 So.2d 246 (La.1974).
In his petition, Hughes asserts that "a legally enforceable contract of employment with a guaranteed minimum term which expires on December 31, 1998 exists between [him] and [the City]." Alternatively, Hughes asserts a quasi-contract exists, which arose out of Hughes' reasonable reliance upon promises made by the Mayor regarding a guaranteed minimum term of service as police chief. He alleges the defendants' conduct represents an anticipatory breach of contract, which is unlawful and, thus, subject to judicial restraint. In essence, Hughes is seeking the specific enforcement of a contract by injunction. See Giron v. Housing Authority of City of Opelousas, 393 So.2d 1267 (La.1981).
In Louisiana, employees may generally be fired for any reason, or for no reason, in the absence of an employment contract for *999 a specified period of time. See La. C.C. art. 2747; Brannan v. Wyeth Laboratories, Inc., 526 So.2d 1101, 1103 (La.1988). Therefore, any right to continued employment is dependent solely on the terms of the employment contract.
There are two types of contracts for hire; the limited duration contact, and the terminable at will contract. In Brodhead v. Board of Trustees for State Colleges and Universities, 588 So.2d 748, 752 (La.App. 1st Cir.1991), writ denied, 590 So.2d 597 (La. 1992), this court addressed the distinction between these types of contracts, as follows:
[U]nder a limited duration contract the parties have agreed to be bound for a certain period during which the employee is not free to depart without assigning cause nor is the employer at liberty to dismiss the employee without assigning any reason for so doing. See L.S.A.-C.C. arts. 2746-2750[.] The period of time which is to be the duration of the contract must be consented to by the parties. The party relying on an alleged contract of employment for a set duration of time has the burden of proof that there was a meeting of the minds on the length of time of the employment. Under facts showing no meeting of the minds, the contract of employment for a set duration of time is void for lack of consent, and what remains is a contract of employment terminable at will. (Citations omitted.)
In the present case, Mayor Muckelroy testified that he and Councilman Bonnette conducted two interviews of Hughes. The Mayor also had other conversations with Hughes prior to the time that the recommendation was made to the Council that Hughes be employed. The Mayor acknowledged that the job description, the responsibilities of the position, salary, employee benefits and the relocation requirement were discussed with Hughes. However, the Mayor testified that he did not discuss a length of employment with Hughes. The Mayor also testified that no other City employees have written employment contracts or fixed terms of employment.
Hughes testified he submitted his resume to the Mayor in person and filled out an application for the position. He spoke to McCormick, a member of the selection committee, who discussed with him the terms of the position, i.e., the approximate salary range, the benefit package, and the proposed length of service. Hughes stated that McCormick told him that the length of service for the position was to be five years and that there would be a contract. Hughes also testified he was interviewed twice by the Mayor. During these interviews, they discussed the proposed salary range, benefits, the relocation requirement, and the requirement that he resign from his position with the Louisiana State Police.
Hughes further testified that length of service was an important issue to him. He intended his new career as chief of police to be a second career; he intended to remain employed with the City long enough to be eligible for a second retirement, which would have entailed more than twelve years of service. He stated that his decision to accept the position on February 28, 1994, was based upon the promises which had been made to him by the Mayor regarding the terms and conditions of the position. He testified that an important consideration was that a five-year term was being offered to him by the Mayor.
Hughes acknowledged City Attorney Jewell had not made any representations to him prior to the time he began working for the City; he did not meet Jewell until after that date. All of his discussions with Jewell regarding the employment contract occurred after he began working for the City.
Councilman Bonnette testified that he participated in interviewing the final four applicants for the chief of police position. He stated a fixed term of employment was not discussed with any of the applicants. He recalled that the Mayor told the applicants that his recommendation would be subject to the Council's approval. Bonnette further testified that the Council did not authorize anyone to offer a fixed term of employment to Hughes or any of the other applicants who interviewed for the position. He stated he did not inform McCormick that the position would be for a fixed term.
*1000 Mr. Wiley McCormick, a retired state policeman, testified he was retained by the City during the latter part of 1993, to examine the police department and render a report. After he recommended a change in leadership, the Mayor decided to hire a new chief of police. McCormick recommended the implementation of a six-month probationary period, and informed the Mayor that he thought the City would need to offer a fixed-term of employment to attract qualified candidates. McCormick stated that although he believed a fixed-term employment contract was important, the Mayor did not acknowledge that the City would offer such a contract. McCormick recalled that the Mayor advised him that he could not sign a contract without Council approval. However, McCormick "thought that that was something that could be worked out during the six month probationary period."
McCormick acknowledged that he told Hughes he thought the City was amenable to a fixed term of employment, but advised Hughes that he needed to discuss it with the Mayor during the interview process. McCormick also stated that he advised each applicant of the six-month probationary period of employment.
In addressing the issue of whether Hughes had been hired by the City for a specified period of time, the court stated the following in pertinent part:
I don't think the Mayor said, "You have a five year contract". I don't think he said that. He testified he didn't say that, and I  I agree with that, but [Hughes] resigned from the State Police, or retired,... moved his family down here; you think he would have more expectation in having a  a one year or two year term? You  you uproot your family, you sell your house and you move out here. He had the expectation. I don't have any doubt ... that he had a  an expectation that he was gon'na be here for a while, and with the discussions, I'm sure with Mr. McCormick, and I  and Mr. McCormick stated that he didn't say that there's a five year term that goes with this ... he didn't give a concrete situation with that, but with the discussions with the Mayor, obviously, you have to offer somebody some period of time or he's not coming. You're not gon'na get the qualified person that you want unless you have  you  you give him the feeling of some type of security here, obviously. You wasn't gon'na get anybody over here from outside if you did not give `em that impression. Somebody's gon'na uproot himself from a good job, his kids from school, if they're in school, and I think he said that on the stand, sell your house, move out here, and then the next year say, "Well, we don't want you anymore". That's not reasonable, and I don't think any of the Council, and I'm looking at `em, I don't think anybody sitting here believes that that's reasonable. That you're gon'na take a job just on a whim, and say, "Well, I'm gon'na move everybody over here, and hope they keep me." That's, you know, for the first six months, yeah. If he did that before the six months was up, that's on his back. You keep him after six months, you give him the expectation that he's gon'na stay here for a while.
Again, I don't think the Mayor said, "You're here for five years". I don't  I don't believe that. I think that the discussions led him to believe that he was gon'na be here for a long time, and he was pushing for as much time as he could, because in one contract, he put more than five years in there if I recall correct; about eleven years, I don't know, but to even discuss the contract with him, the Mayor or the City Attorney, that leads him to believe that there's something in a contract coming up.... [Hughes] expected to have some long term, even if it was just five years. He knew  obviously, he didn't think about the  the end of the Mayor's term as being the end of employment. Mr. Jewell said '99 is too long because it goes beyond his term which would  which is proper. [The Mayor] cannot contract beyond his term according to law.
... I believe, [Hughes] expected to have that job up until that time, and I don't think the Mayor said, "you have it for that time". I don't think he said that, but I think [Hughes] was led to believe this, intentionally, unintentionally.... I don't think there was an intentional deception. *1001 .... I think the Mayor's an honorable person, but even to  to allow him to bring the contract to the City Council, and let him present it, that gives him an expectation. He didn't know what the City Council was gon'na do, or maybe he did, but he was taking a shot, but if the Mayor didn't think that he should have  that he should have a shot at a fixed term, he should have said, "No; we don't have any fixed terms here, you know, we can't do that".
* * * * * *
[Hughes] was led to believe that he was gon'na have a contract, and it was gon'na be for a period of time, and I don't think anybody here can  in their hearts, can say that this man did not believe that.
* * * * * *
As far [sic] a real contract, obviously, there's no written contract. As for an oral contract, there's a quasi contract.... I don't think there was a, "These are my terms, we agree", or "These are our terms, I agree". I don't think it was quite that cut and dry. I think there was a lot of discussion around it. I  I don't think it was that way as far as an oral contract, but as far as a quasi contract, absolutely. I have no doubt about it.
The trial court found there was no written or oral agreement regarding a specified term of employment. The record clearly establishes there was no meeting of the minds regarding the length of time of the employment. However, the trial court ruled in plaintiff's favor based on its finding of a quasi contract. The trial court determined plaintiff was entitled to injunctive relief as demanded in his petition because he was led to believe by the City or its representatives that he would ultimately be awarded a long-term contract. The trial court placed much emphasis on the fact that Hughes' had retired from another position and moved from Baton Rouge to the New Roads area in order to accept the position. The court apparently found plaintiff should prevail based on a detrimental reliance theory.
La. C.C. art. 1967 provides, in pertinent part:
A party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying. Recovery may be limited to the expenses incurred or the damages suffered as a result of the promisee's reliance on the promise. Reliance on a gratuitous promise made without required formalities is not reasonable.
The requirements necessary for recovery under the theory of detrimental reliance are: a representation or promise; a justifiable reliance on the representation or promise, and a change in position to detriment because of the reliance. See Carter v. Huber & Heard, Inc., 95-142, p. 3-4 (La.App. 3d Cir. 5/31/95); 657 So.2d 409, 411; writ denied, 95-1662 (La.10/6/95), 661 So.2d 471; See also Andrus v. Andrus, 93-856, p. 5 (La.App. 3d Cir. 3/2/94); 634 So.2d 1254, 1258.
In the present case, the trial court found, and the record establishes, the parties understood there was a probationary period of employment when Hughes began working as chief of police. The following discussion took place between the court and counsel for defendant during the proceedings:
THE COURT: Obviously, he wasn't gon'na have a contract the day he got there. You have a six month probationary period?
MR. CAZAYOUX: Right.
THE COURT: Who's gon'na give him a contract the first day he got there? It had to be after the  during or after the six month period. You know, who's gon'na do one the first day a guy walks in? He's on a probationary period, and you're gon'na give him a five year contract? No.
The trial court apparently found there was no promise of employment for any specific term when Hughes began working as chief of police. However, even if Hughes was led to believe he would be eligible for a contract for a specific term following the probationary period, Hughes has not established that his reliance on that representation resulted in a change in position to his detriment. The record fails to establish that any change in *1002 position, i.e., that Hughes' resignation from his previous position and relocation to Pointe Coupee, had not already taken place as of the time that Hughes began his probationary period of employment.
Moreover, irrespective of the individuals who were involved in the negotiation process, the contracting parties were Hughes and the City. Article 5 of the City Charter, entitled "Appointed Officers," provides, in pertinent part:
A chief of police shall be appointed by the [Mayor] with the approval of the [Council] who shall serve at the pleasure of the mayor and whose duties and compensation shall be fixed by the [Council].
Article 12 of the City Charter explains the duties and the powers of officers and states in relevant part:
The [Mayor] ... shall have the following powers, duties, and responsibilities:
(a) Supervise and direct the administration and operation of all city departments.... Appointment and dismissal of the ... chief of police ... shall be subject to the approval of the city council....
The Council took no action which Hughes could have construed as the approval of an employment contract for a specified period of time. Hughes cannot avoid the consequences of the Council's failure to specifically consent to an employment contract for a specific term. A person who negotiates with a governmental body is charged with knowledge of the laws governing that body and with the knowledge that the validity of the acts of that governmental body and its representatives is subject to those laws. See Brodhead v. Board of Trustees for State Colleges and Universities, 588 So.2d at 752.
For these reasons, we find Hughes was not entitled to injunctive relief as a result of his reliance on any representations made by those associated with the City. Accordingly, we find plaintiff does not prevail based on the theory of detrimental reliance.

CONCLUSION
For the above reasons, we find plaintiff failed to establish by a preponderance of the evidence that he was entitled to injunctive relief enjoining the defendants from "terminating and/or scheduling or approving the termination of Stanley B. Hughes' employment by the City of New Roads as the Chief of Police for the City of New Roads without sufficient cause through December 31, 1998." Because the trial court erred in rendering that judgment, it is hereby vacated. Costs are to be paid by plaintiff-appellee, Stanley B. Hughes.
JUDGMENT VACATED.