384 So.2d 448 (1980)
CADDO PARISH SCHOOL BOARD et al.
v.
BOARD OF ELECTIONS SUPERVISORS OF CADDO PARISH et al.
No. 67175.
Supreme Court of Louisiana.
May 8, 1980.
Fred H. Sutherland, M. Thomas Arceneaux, Beard, Arceneaux & Sutherland, Shreveport, for plaintiffs-applicants.
William J. Guste, Jr., Atty. Gen., Donald E. Walter, David L. Smelley, Sp. Asst. Attys. Gen., for defendants-respondents.
DIXON, Chief Justice.[*]
Plaintiffs in this case are the Caddo Parish School Board and several of its members. *449 Defendants are the Governor, the Secretary of State, the Caddo Parish Clerk of Court, the Registrar of Voters for Caddo Parish and the Board of Elections Supervisors and its individual members. At issue are Act 506 of 1978 and Act 749 of 1979, identical provisions which require the Caddo Parish School Board to reapportion itself on January 1, 1980 in accordance with certain specified procedures.[1] Plaintiffs petitioned for a declaratory judgment declaring these acts to be illegal, unconstitutional and ineffective, and asked that the defendants be enjoined from enforcing the acts. On crossmotions for summary judgment, the trial court found that there were no disputed issues of fact and that as a matter of law, legislative enactment of the statutes was authorized by the state Constitution.
From the trial court's order granting summary judgment to defendants and dismissing plaintiffs' suit, plaintiffs sought supervisory writs from this court and we granted their application.
The nature of the legislation under attack here can best be understood in the context of the entire constitutional and statutory scheme for the creation and composition of school boards, as this scheme has changed in recent years. Article 8, § 9(A) of the 1974 Constitution authorizes the legislature to create new parish school boards and to provide for the election of their members, while Article 8, § 10(A) provides for the recognition and regulation of those school board systems already in existence. Until recently, R.S. 17:51, 52 and 57, enacted under the authority of provisions of the 1921 Constitution, Article 12, §§ 10 and 11, which were almost identical to those cited above, provided the basic rules for the creation of school boards and the election of members: *450 a parish school board for each parish; the election of members from districts consisting of police jury wards, one member to be elected for each police juror; the election of members in three groups, serving six year over-lapping terms; and certain special provisions for parishes containing municipalities. The New Orleans School Board had been specially created by legislative act by 1870 and its differential treatment continued under subsequent statutes. In 1946 legislation concerning the East Baton Rouge Parish School Board was enacted, providing for the number of members, the districts from which they were to be elected, and their terms of office. In 1952 similar legislation was enacted concerning the Jefferson Parish School Board, and in 1954 similar provisions were enacted concerning the school board of Caddo Parish. All of this legislation was subsequently amended, but the basic structure remained the same: general rules governed the composition of all parish school boards except those of Caddo, East Baton Rouge, Jefferson and Orleans Parishes, for which special rules were provided.
During the decade of the 1960s it became apparent that these regulations for the election of parish school board members would eventually be scrutinized in the light of the constitutional principles enunciated by the United States Supreme Court in Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) and Avery v. Midland County, 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968). Those cases held that government officials, even when members of local governing bodies, may not be elected from districts of substantially unequal population. In order to comply with this new "one man, one vote" requirement, a group of new statutes was enacted in 1968, directing school boards to develop and execute plans for reapportionment in order to replace their current elective districts, usually police jury wards, with districts of substantially equal population.
R.S. 17:71.6 states that in providing for compliance with the requirements of recent United States Supreme Court decisions, "[i]t is also the purpose and intent of this Subpart to permit such school boards as much latitude and discretion as possible in accomplishing such reapportionment within the limits set forth herein." That statute also provides that during the interim period between its effective date and the reapportionment of a school board, the present laws regarding the election of school board members shall remain in full force and effect.
R.S. 17:71.1-71.5 set forth the general rules for the reapportionment process. Each city and parish school board is authorized to reapportion itself into compact and contiguous districts of equal population, on the basis of either the 1970 census or a special census taken for this purpose; the number of school board members may be changed to no less than five and no more than the greater of fifteen and the number presently authorized; terms of office shall be six years except where they are presently four years; each board may fashion its own plan for maintaining the system of overlapping terms of office, if so desired by accomplishing reapportionment over a six year period; and each board is further authorized to reapportion itself on the basis of the 1980 census, thereafter no more often than every ten years.
R.S. 17:61.1, the statute at issue here, was enacted as Acts 1978, No. 506 and Acts 1979, No. 749 to provide specifically for the reapportionment of the school board of Caddo Parish.[2] It provides that on the date of the 1980 congressional elections, nine school board members are to be elected from nine single member districts whose parameters are to be established first by the proposal submitted by an independent firm commissioned by the incumbent board to formulate a reapportionment plan, then by a public hearing on that proposal. Members are to serve for four year terms; to provide for overlapping terms, five members elected in *451 1980 will serve for four years, the other four new members for two years. School board members elected pursuant to this procedure will take office on January 1, 1981. On that date, the offices of the eighteen incumbent members are to be vacated. Thereafter, the school board may reapportion itself no more often than every ten years, on the basis of the federal census. R.S. 17:62.
A comparison of the general reapportionment plan with the plan provided specifically and uniquely for Caddo Parish reveals significant differences. First, the Caddo Parish plan requires the removal from office on January 1, 1981 of the twelve incumbent members whose six year terms would otherwise have continued. In fact, it vacates the offices to which they were elected. The general plan, on the other hand, permits a school board to maintain its incumbent members in office by phasing in members from the newly drawn districts every two years, as the staggered terms of the predecessors expire. Second, the Caddo Parish plan provides for a mandatory number of districts and member representatives, while the general plan establishes only a minimum number and a maximum. Third, the Caddo Parish plan requires that public funds be spent to engage an independent firm to formulate a reapportionment proposal; under the general plan, a school board may simply utilize federal census data. Finally, the Caddo Parish plan requires that reconstitution of the school board be accomplished by January 1, 1981.[3] The general plan, on the other hand, permits a school board to change its composition over a period of six years from the time its apportionment plan is adopted. In these respects, the Caddo Parish plan affords little opportunity for the exercise of latitude and discretion by the present school board, one of the goals expressed by the general legislation.
With one exception, plaintiffs' attack on this statute does not challenge these differences (and apparent inequities) in themselves.[4] Rather, plaintiffs contend that the statute violates the constitutional prohibition against legislative enactment of local or special laws regulating the management of parish public schools, as provided by Article 3, § 12(A)(8).[5] In order to evaluate *452 this contention, it is necessary to determine, first, whether the legislation complained of does constitute a local or special law. In State v. Slay, 370 So.2d 508, 510 (La. 1979), we distinguished general laws from local or special laws in the following terms:
"... A statute is considered special or local if its restrictions can affect only a portion of the citizens or a fraction of the property embraced within the created classification. Davenport v. Hardy, 349 So.2d 858 (La. 1977); State ex rel. Miller v. Henderson, 329 So.2d 707 (La. 1976). A general law, on the other hand, `operates equally and uniformly upon all persons brought within the relations and circumstances for which it provides or operates equally upon all of a designated class, founded upon a reasonable and proper classification.' State v. LaBauve, 359 So.2d 181, 182 (La. 1978).
However, the mere fact that a statute's enforcement is limited to a particular locality does not by itself render the statute a local or special law, simply because the conditions under which it operates may not prevail in all localities. State v. LaBauve, supra; Davenport v. Hardy, supra. The salient characteristic of a special or local law is that it operates in one locality without the possibility of extended coverage to other areas if the requisite criteria of the statutory classification are determined to exist there, or that it affects only a certain number of persons within a class, and not all persons possessing the class characteristics. State ex rel. Miller v. Henderson, supra."
See also Johnson, Legislative Process, 36 La.L.Rev. 549 (1976); Comments, General and Special Laws in Louisiana, 16 La.L.Rev. 768 (1956). In Nomey v. State, 315 So.2d 709 (La. 1975), we found that a statute authorizing parishwide local option referenda in twelve enumerated parishes, but not in the remaining parishes of the state, was a local law. Similarly, in State v. LaBauve, 359 So.2d 181, 183 (La. 1978), which involved a statute prohibiting the use of gill nets only in certain portions of Terrebonne and Lafourche Parishes, we found that "if its operation is limited solely by its specific designation of certain parishes, it must be considered a local law violative of our constitution." The statute at issue refers only to and has effect only upon the school board of Caddo Parish. There is no doubt, therefore, that it is a local law.
A further question is presented by the fact that not all local or special laws are prohibited by the Constitution. Instead, Article 3, § 12 enumerates ten types of local or special laws which are reprobated. Other kinds of local or special laws may be enacted, but only after compliance with the provisions of Article 3, § 13 for publication of intent to introduce such laws a procedure which was in fact followed in introducing the legislation at issue. In the list of local laws which are totally prohibited, Article 3, § 12(8) specifies laws "[r]egulating the management of parish or city public schools, the building or repairing of parish or city schoolhouses, and the raising of money for such purposes." The question, then, is *453 whether a law which controls the composition of a school board by vacating its current offices and by specifying the number of members of which the new school board is to be comprised, the date of their election, and the length of their terms, is a law which regulates the management of the parish school system.
In answering this question we note, first, that the management of parish public schools is entrusted to school boards by R.S. 17:54 and 17:81-85. These statutes authorize school boards to elect school superintendents, to determine the number of schools and their location, and the number of teachers; to select teachers and fix the terms of their employment and their salaries; to secure funds for school operation; to recover for damages to school property; to appoint clerical, medical and maintenance staff and fix their salaries; and to conduct in-service educational programs for teachers. In addition, the school board president is empowered to sign all deeds and contracts for the schools. In Mendel v. Gennaro, 154 So.2d 531 (La.App. 4th Cir. 1963), the court of appeal found that the duties entrusted to school boards do constitute "management" of the schools and that a statute affecting school board membership does "regulate" such management. That holding was overruled in Jefferson Parish School Board v. Jefferson Parish Democratic Executive Committee, 246 La. 51, 163 So.2d 348 (1964). In that case, this court found that "management" concerns curricula, teaching methods, physical training, classroom procedures and scheduling, disciplinary methods, and some aspects of financing. The court also found, however, that a statute providing for the number of school board members and the procedure for their election was not one which controlled members of the school board in the performance of these management functions, and that the statute itself did not treat of the management of public schools. We agree with the Mendel and Jefferson Parish holdings in finding that a school board does indeed manage the public schools under its authority. We note, however, that to "regulate" is "to bring under the control of law or constituted authority." Webster's New International Dictionary, Second Edition, Unabridged, 1955. (Emphasis added). A statute which vacates an existing school board's offices and dictates the number of new school board members and the process by which they are to be elected is one which determines the very constitution of that managing authority, thereby regulating the management functions. To this extent, the Jefferson Parish School Board case is overruled.
One final question is presented by Article 8, § 10(A) of the 1974 Constitution, which provides:
"Parish and city school board systems in existence on the effective date of this constitution are recognized, subject to control and supervision by the State Board of Elementary and Secondary Education and the power of the legislature to enact laws affecting them."
As we have noted, the Caddo Parish School Board system was established by legislative act in 1954, so that it was in existence on the effective date of the 1974 Constitution. The meaning of this provision's authorization of "laws affecting" such preexisting boards becomes clear when the provision is viewed in context. Article 8, § 9 empowers the legislature to create new school boards and to provide for the election of their members. Article 8, § 10(A) is therefore necessary in order to authorize the enactment of general legislation as it pertains to those school boards already in existence. This section does not, however, provide an exception to the express prohibition against local or special laws regulating the management of parish public schools, although its predecessor, Article 12, § 11 of the 1921 Constitution, did so provide:
"Municipal or parish school boards and systems now in existence by virtue of special or local legislative acts are hereby recognized, subject to control by and supervision of the State Board of Education, and the power of the Legislature to further control them by special laws."
*454 The Records of the Louisiana Constitutional Convention of 1973 Convention Transcripts indicate that this change in language was made without debate. We must therefore assume that the deletion of the prior exception to the prohibition against enactment of special laws brought special or local legislation concerning the Caddo Parish School Board within the ambit of that prohibition.
We find, therefore, that R.S. 17:61.1 was enacted in contravention of a constitutional prohibition and that it is null, void and without effect.[6] We also find that defendants must be enjoined from enforcing this invalid statute. In State ex rel. Forsythe v. Ellis, 42 La.Ann. 1104, 8 So. 305 (1890), plaintiffs sought to enjoin an enumeration of population to be performed pursuant to a legislative act, allegedly unconstitutional, providing for the creation of a new parish. Defendants claimed that no court had the power to enjoin the execution of a legislative act of this nature, but this court rejected that contention, finding that any attempt to enforce a law which exceeds constitutional authority is a void exercise of power, which the courts can and must stop. Similarly, in City of Gretna v. Bailey, 140 La. 363, 367, 72 So. 996, 997 (1916), we stated that "[i]njunction is the proper remedy to restrain an officer from acting under an unconstitutional statute."[7]
The judgment of the court below is reversed, and there is now judgment in favor of plaintiffs and against defendants, enjoining them against enforcing R.S. 17:61.1 and 17:62, at defendants' cost to the extent provided by law.
MARCUS, J., concurs and assigns reasons.
MARCUS, Justice (concurring).
In my view, Jefferson Parish School Board v. Jefferson Parish Democratic Executive Committee, 246 La. 51, 163 So. 2d 348 (1964), was correctly decided. Hence, I do not consider La. R.S. 17:61.1, which vacates an existing school board's offices and dictates the number of new school board members and the process by which they are to be elected violates La. Const. art. 3, § 12(8)'s prohibition of local or special laws regulating the management of parish or city public schools. However, I consider the statute to be unconstitutional for other reasons. La. Const. art. 10, §§ 24-26 provide for impeachment, removal by suit, and recall. In my view, these are the only methods by which elected officials may be removed from office. La. R.S. 17:61.1 declares the Caddo Parish School Board offices to be vacated and in effect removes the officials elected to serve on it. This procedure is not authorized by the constitution. Therefore, its use must be enjoined by this court. Accordingly, I respectfully concur.
NOTES
[*] Honorable EDWIN W. EDWARDS, Justice Ad Hoc, recused.
[1] R.S. 17:61.1, Acts 1979, No. 749, provides:

"Caddo Parish School Board; reapportionment; single-member districts; public hearing; terms of office; compensation, qualifications, vacancies
A. Effective January 1, 1981, the offices of the members of the Caddo Parish School Board shall be vacated and the board shall be re-created and shall be composed of nine members elected from single-member districts. The Caddo Parish School Board shall adopt a reapportionment plan, as otherwise provided in this Section, to provide for such districts. The Caddo Parish School Board shall commission an independent firm to formulate a reapportionment plan, and is hereby authorized to expend its funds for this purpose. The proposed reapportionment plan required herein shall provide for nine singlemember districts. Such districts shall be comprised of as equal population as practicable, utilizing the latest and recognized population data for Caddo Parish and the city of Shreveport, and shall be compact and contiguous.
B. Prior to the adoption of an apportionment plan by the board, the Caddo Parish School Board shall order a public hearing on the proposed plan formulated by the independent firm and shall cause to be published in a newspaper published within the parish at least twenty days prior to the date of such hearing a public notice which shall include the day, time, and place of the public hearing, a general summary and map of the proposed plan, and the times and places where copies of the proposed plan shall be available for public inspection prior to the date of the hearing. Based on the plan formulated by the independent firm and on such hearings, the board shall adopt an apportionment plan for the election of the members of the board, which plan shall meet the criteria established in Subsection A hereof.
C. The reapportionment plan adopted by the board pursuant to this Section shall become effective commencing with the election for school board members to be held at the time of the congressional elections in 1980. One member shall be elected from each of the nine single-member districts provided in such plan. Members so elected shall serve overlapping terms with five members being elected in 1980 to serve four-year terms and the remaining four members being elected in 1980 to serve two-year terms. Thereafter, all successors shall be elected to serve overlapping four-year terms.
D. Members of the board in office on July 10, 1980, shall serve until January 1, 1981, at which time the terms of the members elected at the congressional elections in 1980 shall commence. The terms of the successors of the members taking office in 1980 shall commence on January 1, of the year following their election.
E. Members of the Caddo Parish School Board shall receive the same remuneration, possess the same qualifications, and qualify as candidates for election in the same manner as is now or hereafter provided by law for members of other parish school boards. A vacancy occurring on the board shall be filled in the manner now or hereafter provided for filling of vacancies in other parish school boards."
[2] These acts are identical. Introduction of the 1979 bill was recommended by the Attorney General because presentation of the 1978 bill failed to comply with the notice procedures for permissible special or local legislation required by Article 3, § 12 of the Constitution.
[3] An initial reapportionment, providing for the present eighteen member board, was accomplished in 1972 under order of the United States District Court for the Western District of Louisiana and was found valid and constitutional by that court. Plaintiffs contend that this statute therefore requires the school board to reapportion itself within eight years, while the general rule prohibits reapportionment at intervals of less than ten years. They also claim that the board had formulated plans to reapportion itself at the end of the statutory ten year period, in 1982, reducing its size to twelve members without truncating the terms of incumbent officers, and utilizing 1980 federal census data.
[4] Plaintiffs contend that by vacating all school board offices on January 1, 1981, the statute reduces the compensation of members during the terms for which they were elected, in violation of Article 10, § 23 of the Constitution.
[5] Article 3, § 12 of the 1974 Constitution provides:

"Prohibited Local and Special Laws
Section 12. (A) Prohibitions. Except as otherwise provided in this constitution, the legislature shall not pass a local or special law:
(1) For the holding and conducting of elections, or fixing or changing the place of voting.
(2) Changing the names of persons; authorizing the adoption or legitimation of children or the emancipation of minors; affecting the estates of minors or persons under disabilities; granting divorces; changing the law of descent or succession; giving effect to informal or invalid wills or deeds or to any illegal disposition of property.
(3) Concerning any civil or criminal actions, including changing the venue in civil or criminal cases, or regulating the practice or jurisdiction of any court, or changing the rules of evidence in any judicial proceeding or inquiry before courts, or providing or changing methods for the collection of debts or the enforcement of judgments, or prescribing the effects of judicial sales.
(4) Authorizing the laying out, opening, closing, altering, or maintaining of roads, highways, streets, or alleys; relating to ferries and bridges, or incorporating bridge or ferry companies, except for the erection of bridges crossing streams which form boundaries between this and any other state; authorizing the constructing of street passenger railroads in any incorporated town or city.
(5) Exempting property from taxation; extending the time for the assessment or collection of taxes; relieving an assessor or collector of taxes from the performance of his official duties or of his sureties from liability; remitting fines, penalties, and forfeiture; refunding moneys legally paid into the treasury.
(6) Regulating labor, trade, manufacturing, or agriculture; fixing the rate of interest.
(7) Creating private corporations, or amending, renewing, extending, or explaining the charters thereof; granting to any private corporation, association, or individual any special or exclusive right, privilege, or immunity.
(8) Regulating the management of parish or city public schools, the building or repairing of parish or city schoolhouses, and the raising of money for such purposes.
(9) Legalizing the unauthorized or invalid acts of any officer, employee, or agent of the state, its agencies, or political subdivisions.
(10) Defining any crime.
(B) Additional Prohibition. The legislature shall not indirectly enact special or local laws by the partial repeal or suspension of a general law."
Similar provisions have appeared in the Constitutions of Louisiana since 1879.
[6] We also take notice of the fact that the statute additionally violates Article 3, § 12(A)(1), supra note 5. It is a local or special law for the holding and conducting of school board elections, and there is no exception to this constitutional prohibition.
[7] The situation before us here should be distinguished from that presented in Dubuisson v. Board of Supervisors of Election of Parish of St. Landry, 123 La. 443, 49 So. 15 (1909), in which this court found that injunction of a particular election was not an appropriate remedy. In Dubuisson, a legislative act provided for the creation of a new parish by majority vote, but the Constitution required a two-thirds vote of qualified electors for such a purpose. The court noted that an unconstitutional act may be enjoined when it is a statute having the force of law in itself, but it found that the act before it was merely a legislative proposition which required ratification by popular vote. R.S. 17:61.1 is a statute which has the force of law in itself: current school board offices are vacated and new positions created by legislative fiat, and the 1980 election functions only to fill the legislatively created new positions.