PARRO, J.
|2The St. Helena Parish School Board (the Board) appeals a judgment in favor of the Charter School of Pine Grove, Inc. (Pine Grove), declaring that a valid contract existed between the parties for the establishment and operation of a Type 1 charter school in St. Helena Parish and that the Board breached that contract by attempting to rescind it and by not responding timely to Pine Grove’s attempts to start the charter school. The judgment ordered a contract extension for five years, beginning with the 2007-08 school year, issued a permanent injunction against the Board from interfering with the contract, and ordered the Board to promptly perform its ministerial duties to proceed with the contract. For the following reasons, we amend the judgment in part and affirm as amended.
FACTUAL AND PROCEDURAL BACKGROUND
On April 19, 2004, after months of discussions, the Board voted in a public meeting to approve a Type 1 charter school for Pine Grove.[1] The Board’s president, James Baker, signed the contract at that meeting, and it was signed by Pine Grove on April 28, 2004. The contract, entitled “Charter School Agreement,” provided for a five-year term, beginning with the 2004-OS school year. On May 21, 2004, the Board and Pine Grove jointly filed a “Motion for Authorization to Operate Charter School” in the United States District Court for the Middle District of Louisiana, pur *214 suant to an order in an existing desegregation case, seeking approval for Pine Grove to' operate a Type 1 charter school as outlined in the Charter School Agreement. That approval was granted in a consent order signed on December 2, 2004.[2]
After the contract had been signed by the parties and authorized by the federal district court, the Board received a financial analysis from a school district employee, indicating that the transfer of the state’s Minimum Foundation Program (MFP) funds to Pine Grove could cause a financial hardship for the rest of the parish public school |3system, prompting the Board to attempt rescission of the Charter School Agreement. On February 5, 2005, the Board voted to rescind its prior action of entering into the contract with Pine Grove. Upon learning of this action, Gary Wheat, the Board of Elementary and Secondary Education (BESE) administrator of the state’s charter school program, put the federal grant funding process for Pine Grove on hold and told Pine Grove that since BESE had no guarantee that the school would open, Pine Grove would not be eligible for federal grant money.' Wheat then sought guidance from BESE’s attorneys and from the U.S. Department of Education, which controlled the grant funding, concerning what BESE’s future actions should be with respect to Pine Grove.
On February 15, 2005, Pine Grove filed this lawsuit against the Board, seeking a declaratory judgment, injunctive relief, a writ of mandamus, and alternatively, damages for breach of contract.[3] After a hearing, the court declared that a valid contract had been formed and that the Board’s efforts to rescind the contract were null and void, because the votes — 3 to rescind, 2 against, and 1 abstention — did not constitute a majority of the six-person Board, as required by law for its decisions.[4] The court further found that the Board had tried to obstruct Pine Grove’s efforts, thus potentially causing irreparable harm due to the time constraints of the contract. In a judgment dated May 13, 2005, the court granted a preliminary injunction, prohibiting the Board from disposing of, alienating, or encumbering any of the funds that would be allotted to Pine Grove. The judgment also enjoined the Board from preventing any of the ministerial duties required to allow Pine Grove to proceed and from enforcing its resolution of February 5, 2005, which purportedly rescinded or revoked approval of the Charter School Agreement. The judgment made the writ of mandamus peremptory, ordering the Board to perform the ministerial duties required to allow Pine Grove to open and ^operate a charter school, including the transfer to Pine Grove of MFP funds delivered to the Board for the operation of Pine Grove’s charter school.[5],[6]
*215 Despite this judgment, on June 1, 2005, Baker wrote a letter to Wheat, in which he said that “it is highly unlikely that the Pine Grove Charter School will open in St. Helena Parish for the upcoming school year, if ever.” The letter raised “serious concerns regarding school desegregation” issues, suggesting the ultimate purpose of the charter school proponents was “to use public school dollars as leverage to finance construction of a private school catering primarily to the white community.” The letter further emphasized that the Board “had been misinformed by the advocates and the charter school as proposed would bankrupt the St. Helena school system.” Baker asked BESE to join the Board’s efforts to resist the creation of the Pine Grove charter school.
Eventually, in light of the court’s preliminary injunction and mandamus ruling, Wheat received assurances from federal authorities that grant money could be released and paid to Pine Grove over a three-year period. In an e-mail dated November 23, 2005, Wheat apprised Pine Grove that it could apply for grant funding, but warned that once it received the first year’s grant, a thirty-six-month time period would begin running. Only eighteen months of that period could be used for planning and program design. Wheat advised that if Pine Grove did not succeed in timely opening and operating the charter school, the second and third years’ grants would be forfeited. He later testified that those grants were worth $200,000 for each year. Wheat noted that as a result of the litigation, Pine Grove’s school opening had already been delayed twelve months, and warned that if the lawsuit “drags on for another 12, 18, 24 months or more,” preventing opening of the school, Pine Grove might exhaust its eligibility for federal grant funding before the school opened.
Because of the delays inherent in the litigation process and the uncertainties engendered by the Board’s actions, Pine Grove decided not to apply for grant money until a final judgment was rendered in this litigation. In January 2006, Pine Grove filed | 6a supplemental petition, adding a request for specific performance of the contract and for an extension of its term to allow Pine Grove to have a full five-year charter.
Along with its supplemental petition, Pine Grove filed a motion to hold the Board in contempt for violating the court’s injunction and mandamus orders. It contended the Board had refused to institute the necessary contacts and communications with Pine Grove in order to permit Pine Grove to comply with provisions of the Charter School Law relating to operations, transportation, staffing, facility construction, academic performance requirements, and related matters. Pine Grove further contended that the Board had authorized its attorney to engage in a pattern of litigation and other activities designed to delay, impair, impede, and/or prevent Pine Grove’s efforts to commence operation, all for the purpose of causing its charter to lapse. After a hearing on February 24, 2006, the court found the Board was in contempt and ordered it to comply with the injunction and mandamus and to meet with Pine Grove’s representatives within thirty days toward accomplishment of that end.[7]
*216 Following a two-day trial on the merits in October 2006, the court rendered a judgment, decreeing that a valid contract for a Type 1 charter school existed and that the Board had breached the contract by trying to rescind it and by failing to respond appropriately to Pine Grove’s attempts to start up the charter school. The court ordered a five-year extension of the Charter School Agreement in lieu of damages, enjoined the Board from interfering with the contract, and ordered the Board to perform its ministerial duties to allow Pine Grove to proceed with the contract. The judgment was signed November 20, 2006. The Board’s motion for a new trial was denied, and this appeal followed.
FIRST ASSIGNMENT OF ERROR
The Board’s first assignment of error is that the trial court had no jurisdiction over this dispute between a charter school applicant and a local school board regarding denial of a charter school application, because the Charter School Law provides for appeal by the applicant to BESE, and Pine Grove had not exhausted its administrative | ^remedies before filing suit. The statute relied on by the Board is LSA-R.S. 17:3983(A)(2)(a)(i), which states, in pertinent part:
Each proposal for a type 1 or type 3 charter school shall first be made to the local school board with jurisdiction where the school is to be located.... If, after review as required by R.S. 17:3982, the local school board denies the proposal, or if conditions placed on the proposal by the local school board ... are not acceptable to those proposing the charter, then a proposal for a type 2 charter school may be made to the State Board of Elementary and Secondary Education.[8]
Pine Grove contends that the Board’s argument concerning “appeal” to BESE is incorrect, because the statute only allows recourse to BESE if the charter school proposal was denied or if the conditions placed on it by the local school board were unacceptable, neither of which occurred in this case. Based on the clear wording of the statute, we agree. The contract was not denied, but was approved by the Board, and the contract’s conditions were acceptable to Pine Grove. Therefore, under the facts of this case, this statute is inapplicable. Additionally, the statute does not prescribe an “appeal” process, but provides an alternative application process that the proponents of a charter school may use if their proposal to a local school board is denied or if the contract conditions are unacceptable to the proponents. Wheat testified that he was unaware of any administrative remedies that Pine Grove could obtain through BESE in an effort to remedy the stalemate between the parties. Perhaps Pine Grove could have decided to apply to BESE for a Type 2 charter school, but it was not required to do so before filing suit. We conclude, therefore, that LSA-R.S. 17:3983(A)(2)(a)(i) did not in any way affect the jurisdiction of the district court or this court over this litigation.
SECOND ASSIGNMENT OF ERROR
The Board’s second assignment of error is that the trial court abused its discretion and exceeded its jurisdiction in granting injunctive relief and mandamus, in finding the Board in contempt, in ordering specific performance of the contract, in extending the contract in contravention of applicable statutes, and in ignoring the discretionary duties entrusted to the Board under the *217 Charter School Law. The Board |7also claims the contract itself was null and void, because the Board did not follow the required legal procedures before voting to approve the Charter School Agreement. As this assignment of error includes multiple issues, we will address them individually-

Validity of Contract

The first matter to be addressed is the validity of the Charter School Agreement. Louisiana Revised Statute 17:3983(D) states that before approving a charter for a Type 1 school, the local school board considering the proposal must hold a public meeting for the purpose of considering the proposal and receiving public input. Such a meeting is to be held after reasonable efforts have been made to notify the public of the meeting and its content. The Board contends it did not hold the requisite public meeting before voting in favor of the contract, and therefore, the contract is null and void.[9] The evidence simply does not support this argument. There are newspaper clippings in the record that show publication in the local newspaper of the minutes of several meetings of the Board during which Pine Grove’s charter school proposal was discussed. The minutes of one of those meetings stated that the charter school proposal would be discussed further at the next meeting and gave the date of that meeting. All of those meetings were open to the public, and at some of them, members of the public did appear and ask questions concerning the charter school proposal. Moreover, the Board represented to the federal district court that the Charter School Agreement was a valid contract between the parties and asked for authorization to open and operate a Type 1 charter school in accord with its provisions. This constitutes an admission by the Board that the contract was valid.
However, the Board also contends that the contract could not be entered into between the parties, because the St. Helena Parish public school system had been | ^declared to be in academic crisis, and thus, pursuant to LSA-R.S. 17:3982(A)(1 )(b),[10] the Board could not act upon Pine Grove’s application for a Type 1 charter school. The only testimony to that effect was from Baker, who said, in response to questions about the school system’s financial situation, that the state department of education had classified the system as being in “financial crisis and academic crisis.” However, there was no indication of when that classification might have been made or whether the Board had been advised of that situation before it entered into the Charter School Agreement with Pine Grove. Nor was there any indication that this information was communicated to Pine Grove, as is also required by LSA-R.S. 17:3982(A)(l)(b). The Board simply did not support that statement with sufficient evidence to establish the invalidity of the contract it signed. *218 Therefore, we agree with the trial court that the Charter School Agreement was a valid contract between the Board and Pine Grove.

Breach of Contract

We also agree that the Board breached that contract by trying to withdraw its approval or rescind the contract without having any of the statutory grounds for such action. Louisiana Revised Statute 17:3992(C) provides:
A school charter may be revoked by the authority that approved its charter upon a determination by an affirmative vote of at least a majority of the local board membership ... that the charter school or its officers or employees did any of the following:
(1) Committed a material violation of any of the conditions, standards, or procedures provided for in the approved charter.
(2) Failed to meet or pursue within the agreed timelines any of the academic and other educational results specified in the approved charter.
(3) Failed to meet generally accepted accounting standards of fiscal management.
(4) Violated any provision of law applicable to a charter school, its officers, or employees.
There was no showing that when the Board attempted to rescind the contract, it did so on the basis of any of the above grounds. Rather, the testimony establishes that the | .Board’s attempt to withdraw its consent was based solely on an estimate showing that the financing of the other public schools in the St. Helena Parish school system might be adversely affected by the transfer of MFP funds to Pine Grove’s charter school. This is not one of the statutorily mandated grounds for which a charter school contract can be revoked. Moreover, the contract itself provides that it could be terminated for any grounds provided by LSA-R.S. 17:3991-3999 or for any material breach of the agreement, none of which occurred or formed the basis of the Board’s decision. Therefore, we agree with the trial court that the Board’s attempt to rescind the contract without having any of the grounds specified in the contract or the Charter School Law, along with the Board’s delaying tactics, constituted a breach of the contract.

Injunctive Relief

The next issue for our consideration is whether the trial court erred in granting injunctive relief. An injunction shall be issued in cases where irreparable injury, loss, or damage may otherwise result to the applicant. LSA-C.C.P. art. 3601(A). Irreparable injury is that which cannot be adequately compensated with monetary damages. See Lassalle v. Daniels, 96-0176 (La.App. 1st Cir.5/10/96), 673 So.2d 704, 709, writ denied, 96-1463 (La.9/20/96), 679 So.2d 435, cert. denied, 519 U.S. 1117, 117 S.Ct. 963, 136 L.Ed.2d 848 (1997). The issuance of a permanent injunction takes place only after a trial on the merits, in which the burden of proof must be carried by a preponderance of the evidence, rather than a prima facie showing. See Hughes v. Muckelroy, 97-0618 (La.App. 1st Cir.9/23/97), 700 So.2d 995, 998. The trial court has great discretion to grant or deny injunctive relief, and its determination should not be disturbed ab sent manifest abuse of discretion. State through, Louisiana State Bd. of Examiners of Psychologists of Dep’t of Health aoid Human Services v. Atterberry, 95-0391 (La.App. 1st Cir.11/9/95), 664 So.2d 1216, 1220.
The Charter School Agreement between the parties was signed in April 2004 and *219 provided for a five-year term, beginning with the 2004-05 school year. This case was filed in February 2005 and was tried in October 2006. By that time, two full school years of the original contractual term had passed and another had already commenced without the school being opened. According to LSA-R.S. 17:3983(A)(4)(d), a charter |inschool is required to begin operation by not later than twenty-four months after the final approval of the charter, unless the school is engaged in desegregation compliance issues, in which case it must begin operation no later than thirty-six months after approval of the charter. If such operation does not occur, the charter for that school is automatically revoked, although a new charter may be proposed if the limit on the total number of charter schools allowed in the state, ie., 42, has not been reached. See LSA-R.S. 17:3983(A)(4)(a) and (d). These simple facts and the statutory requirements demonstrate that the Board’s delaying tactics and this lawsuit had, by the time of trial, already caused irreparable harm, because the Pine Grove charter school had not been able to commence operations and its very existence was threatened unless the court granted it equitable relief.
Joseph Lombardo, a founding member of Pine Grove and its current president, testified that before the Board attempted to rescind the contract, Pine Grove had an option to purchase a forty-acre piece of property on which to build the school; that option expired with the passage of time. Pine Grove had also taken many preliminary steps toward opening the charter school, including having the school site surveyed, having a wetland survey performed, purchasing insurance, advertising throughout the country for teachers, enrolling student applicants, holding community meetings to promote the charter school, advertising the school in various educational journals, and training the persons selected as principal and student life director. All of those activities were halted when it became clear that the Board would continue to oppose Pine Grove’s efforts to open the school. Because of the long delay during this litigation, all of those preliminary steps will have to be re-done. At the present time, the 2008-09 school year has already commenced. Thus, even with the trial court’s contract extension in its judgment, which extended the contract for five years beginning with the 2007-08 school year, one full school year of that extension has passed and another has begun with no progress toward the opening of the school. We note that for the last four years, Pine Grove has been deprived of the opportunity to open a new public school in which innovative teaching methods might transform the learning experience for the children of St. Helena Parish. That injury is irreparable in money damages. ^J^Moreover, the purposes underlying the Charter School Law would be completely undermined if a local school board could, simply by stalling and delaying, prevent a charter school from opening even when it is proceeding in good faith and in reliance on that board’s contractual approval of its existence. Accordingly, we find that Pine Grove proved, by a preponderance of the evidence, that without in-junctive relief, it would suffer irreparable harm.
However, the Board claims injunc-tive relief is not permissible, because LSA-C.C.P. art. 3601(A) and LSA-R.S. 13:4062 prohibit any court from ordering such relief to compel the expenditure of public funds by any state department, board, or agency, when the director of such department, board, or agency certifies that the expenditure of such funds would create a deficit in the funds of said agency. The Board contends that because Baker testified that the transfer of MFP *220 funds to Pine Grove would create a deficit in the Board’s funds, the court could not compel the expenditure of those funds by the Board for the charter school. We disagree. Many provisions of the constitution and revised statutes contain definitions that differentiate between state agencies and political subdivisions, such as local school boards.[11] After reviewing these and many other similar provisions of state law, we conclude that LSA-C.C.P. art. 3601(A) and LSA-jR.S.12 13:4062 do not apply to political subdivisions, such as the Board.[12] Moreover, the funds at issue do not belong to the Board, but are federal, state, and/or local funds that are transferred to the Board to be distributed and administered for the benefit of all the public school children within the parish.
After considering all the Board’s arguments and examining the facts of this situation and the law applicable to injunctive relief, we conclude that the trial court did not abuse its vast discretion in granting injunctive relief to Pine Grove in this case. Mandamus
The Board also contests the trial court’s implicit mandamus ruling. The pertinent *221 portion of the judgment states that “the [Board] is ordered to promptly perform their (sic) ministerial duties to proceed with the contract.” The Board contends this provision of the judgment constitutes a writ of mandamus against it that was not appropriate, because the charter school program involves “a conglomeration of indeterminate discretionary decisions” by the Board in evaluating the viability and soundness of a proposed charter school operation. These decisions must be made after the charter school contract has been preliminarily approved in order to define and negotiate the respective responsibilities of each party to the contract, to advance the process toward opening the school, and then to monitor the operations of the school for compliance with all applicable laws and regulations. The Board contends the court abused its discretion in attempting to define the Board’s discretionary actions and evaluative decisions as “ministerial.”
Article 3863 of the Louisiana Code of Civil Procedure provides, in pertinent part, that a writ of mandamus may be directed to a public officer to compel the performance of a ministerial duty required by law. In re Belle Co., L.L.C., 06-1077 and 1078 (La.App. 1st Cir.12/28/07), 978 So.2d 977, 982, writs denied, 08-0220 and 0229 (La.3/24/08),13 977 So.2d 957 and 958. Mandamus is an extraordinary remedy, which must be used by the courts sparingly to compel something that is clearly provided by law, and only where it is the only available remedy or where the delay occasioned by the use of any other remedy would cause an injustice. See LSA-C.C.P. art. 3862; Allen v. St. Tammany Parish Police Jury, 96-0938 (La.App. 1st Cir.2/14/97), 690 So.2d 150, 153, writ denied, 97-0599 (La.4/18/97), 692 So.2d 455. Moreover, mandamus will not lie in matters in which discretion and evaluation of
evidence must be exercised. The remedy of mandamus is not available to command performance of an act that contains any element of discretion, however slight. Sund v. St. Helena Parish Sch. Bd., 05-2473 (La.App. 1st Cir.5/5/06), 935 So.2d 219, 221, writ denied, 06-1392 (La.9/22/06), 937 So.2d 392. Further, mandamus is to be used only when there is a clear and specific legal right to be enforced or a duty which ought to be performed. It never issues in doubtful cases. City of Hammond v. Parish of Tangipahoa, 07-0574 (La.App. 1st Cir.3/26/08), 985 So.2d 171,181.
The question in this case is whether the performance sought by Pine Grove in its suit is of a ministerial duty required by its contract or by operation of law, or a matter in which discretion and evaluation of evidence must be exercised by the Board. After thoroughly reviewing the Charter School Agreement and the evidence presented by both parties in this case, we agree that there are discretionary elements in the steps the Board must take in order to perform its duties under the contract. Wheat testified that approval of the initial Charter School Agreement is only the beginning of a process leading up to and including the operation of a charter school. That process requires the local school board to review the steps taken by the charter school proponents to determine whether all statutory requirements have been followed and whether the school is ready to open. After the school is fully operative, the local school board has continuing oversight to ensure that the charter school is following the conditions, standards, and procedures specified in its charter; that it is meeting the academic and other educational results specified in its charter; that its finances are being managed responsibly and in accord with generally accepted accounting standards; and that it is operating in compliance with *222 all provisions of law applicable to a charter school, its | ^officers, and its employees. See LSA-R.S. 17:3992(C). Such oversight involves an evaluative function that is inherently discretionary to some extent. Therefore, given the strict parameters within which mandamus can be ordered, we agree with the Board that such a remedy was legally inappropriate in this case. To the extent the trial court’s judgment constituted a mandamus order, that portion of the judgment was legal error.

Specific Performance

However, this conclusion does not end our inquiry concerning the enforcement of the Charter School Agreement. As previously noted, Pine Grove amended its petition to seek specific performance of the contract, and the judgment of the trial court implicitly granted that remedy in ordering the Board to “promptly perform” its ministerial duties to proceed with the contract. The Board has challenged the trial court’s right to grant specific performance of the Charter School Agreement.
Upon an obligor’s failure to perform an obligation to do, the granting of specific performance is at the discretion of the court. See LSA-C.C. art.1986. Under Louisiana’s civil law system, specific performance is the preferred remedy for breach of contract. An obligee enjoys the right to demand, insofar as is practicable, the specific performance of the obligation. Lombardo v. Deshotel, 94-1172 (La.11/30/94), 647 So.2d 1086, 1090; see LSA-C.C. art.1986. An obligee has a right to specific performance for breach of contract except when it is impossible, greatly disproportionate in cost to the actual damage caused, no longer in the creditor’s interest, or of substantial negative effect upon the interests of third parties. J. Weingarten, Inc. v. Northgate Mall, Inc., 404 So.2d 896, 901 (La.1981). When specific performance is impracticable or when the court, in its discretion, refuses to grant specific performance of an obligation to do, the court may instead fix damages. Lombardo, 647 So.2d at 1090; Bourgeois v. Dunn, 01-1185 (La.App. 1st Cir.6/21/02), 822 So.2d 708, 711. The remedy of specific performance may, under some circumstances, be enforced by injunction. The petitioner must have a substantive right to specifically enforce an obligation in order for an injunction to be used as a procedural remedy to enforce the obligation. See J. Weingarten, Inc., 404 So.2d at 899.
| ;r,Given this court’s conclusion that the contract between the parties in this case is valid, Pine Grove has a substantive right to enforce its provisions. Moreover, this court has further found that the Board breached that contract and that Pine Grove will suffer irreparable harm as a result of that breach, thus justifying injunctive relief. The remaining issues concerning the propriety of the remedy of specific performance include whether it is impracticable or impossible, greatly disproportionate in cost to the actual damage caused, no longer in the creditor’s interest, or of substantial negative effect upon the interests of third parties. According to the Charter School Agreement, the Board is to: (1) comply with the terms of the agreement and all applicable local, state, and federal laws, along with all regulations adopted by BESE; (2) defend and indemnify Pine Grove against claims brought against it as a result of the operation of district public schools other than the charter school;[13] (3) provide transpor *223 tation to the charter school as it does to any other public school in the district, and be reimbursed by Pine Grove for this service on a monthly basis; (4) forward to Pine Grove, within five days of receipt, any federal funds received on behalf of and for the benefit of the charter school students; (5) distribute monthly per-pupil MFP funding, as calculated by BESE, to the charter school within five days of receipt from BESE; (6) include in those monthly payments the local tax dollars allocated to the charter school; (7) turn over to Pine Grove, within five days of receipt, any other funding allowed to a public school student by local, state, or federal funds, which funds follow those children wherever they attend school, including the charter school; and (8) execute all documents to establish the exclusive authority of the education provider of Pine Grove to hire and fire staff and faculty and to establish the salaries for said personnel.
None of these duties are impossible or impracticable to perform, and it certainly is still in Pine Grove’s interest to have these obligations fulfilled by the Board. The more complex assessments involve consideration of whether the costs of specific performance are greatly disproportionate in cost to the actual damage caused by the |i(ibreach of contract or whether specific performance would have a substantial negative effect upon the interests of third parties. The Board contends that specific performance of this contract would cause financial hardship to the other public schools in the district, because a substantial portion of the funds needed for them operations would be diverted to the charter school, thus causing severe negative consequences to the school district and the children who seek an education in the other public schools in the district. The Board presented evidence, through the testimony of Amy Holland, supervisor of business services for the Board, that the transfer of MFP funds to Pine Grove would cause financial hardship to the district as a whole. Holland testified that opening the charter school would “bankrupt” the system and further stated that the charter school would get more money per pupil than the other public schools. However, she later admitted that she did not actually know about the per-pupil amount and had looked only at gross revenue loss without considering the corresponding reduction of expenses that would occur in the other public schools when some of their students were being educated at the charter school. Furthermore, she had not considered that some of the costs would be reimbursed by Pine Grove, such as any transportation provided by the school district. Therefore, we are not persuaded by this testimony or evidence that the costs of specific performance are greatly disproportionate to the actual damage caused by the breach of contract or that specific performance would have a substantial negative effect on the interests of third parties.
In addition, we are struck by the Board’s insistence that an allocation of “per-pupil” funds to a charter school is somehow a depletion of the funds available to the parish public school system. This argument seemingly considers the charter school as something other than a public school, when the legislation clearly includes such schools within the public school system. Moreover, with the addition of federal grant money for the charter school, the public school system will actually have more total funds available for the *224 education of public school children within the parish.
Thei'efore, after considering all the jurisprudential factors for and against the enforcement of specific performance of this contract, we conclude that Pine Grove established its right to specific performance. We interpret the trial court’s statement 117ordering the Board to “promptly perform their (sic) ministerial duties to proceed with the contract” as ordering specific pei'formance of the contract, and find no legal error in ordering such x-emedy. Contempt of Court
The Board contends the trial couiT abused its discretion in finding the Board in contempt of its preliminary injunction and mandamus ruling.[14] Contempt of court is defined in LSA-C.C.P. art. 221 as “any act or omission tending to obstruct or intei-fere with the orderly administration of justice, or to impair the dignity of the court or inspect for its authority.” There are two types of contempt. A direct contempt is one committed in the immediate view and pi-esence of the court and of which it has personal knowledge. LSA-C.C.P. art. 222. A constructive contempt of court is any contempt other than a direct one, including willful disobedience of any lawful judgment, order, mandate, writ, or process of the court. LSA-C.C.P. art. 224(2).
In this case, the Board is alleged to have committed constructive contempt of the coui't’s May 13, 2005 judgment, based on its alleged intentional and bad faith refusal to institute the contacts and cooperation needed for Pine Grove to meet its obligations under the Charter School Law and in willfully engaging in a pattern of dilatory tactics designed to prevent Pine Grove’s efforts to commence operations of the school and to cause its charter to lapse. To find a person guilty of constructive contempt, it is necessary to find that he or she violated the order of the court intentionally, knowingly, and purposely, without justifiable excuse. Barry v. McDaniel, 05-2455 (La.App. 1st Cir.3/24/06), 934 So.2d 69, 73. The trial court is vested with gx'eat discretion in determining whether a party should be held in contempt of court, and its decision will be reversed only when the appellate court discerns a clear abuse of that great discretion. Haydel v. Pellegrin, 07-0922 (La.App. 1st Cir.9/14/07), 970 So.2d 629, 632.
The Boai'd argues that the finding of contempt was an abuse of discretion, 118because by the time the motion for contempt was filed, Pine Grove had made a “business decision” not to begin the grant application process until this litigation was resolved, and it did not disclose that decision to the coui’t. Therefore, according to the Boai'd, it was Pine Grove’s decision, rather than the Board’s action or inaction, that was delaying implementation of the contract. This ai'gument is circular. The evidence supports the court’s conclusion that the Board was engaged in delaying tactics, despite the court’s order. Following the preliminary injunction, the Board continued to ask for infoi'mation that had already been provided to it in connection with the consent order in the federal court and sent a letter to BESE on June 1, 2005, in which it asked BESE to join it in resisting Pine Grove’s attempts to open the chai'ter school on the basis of spurious desegregation issues that had already been addressed by the federal court in its consent order. Thus, Pine Grove’s “business *225 decision” was caused by the Board’s dilatory tactics, which, if they precluded Pine Grove from opening the charter school, would result in the forfeiture of federal grant money. Had the court known about Pine Grove’s decision, that knowledge would have supported, rather than undermined, the court’s conclusion that the Board was still stalling in an effort to defeat Pine Grove’s ability to move toward opening the charter school. Moreover, the court had ample other evidence of the Board’s intentional and active resistance to Pine Grove’s efforts, including its refusal to meet with Pine Grove’s representatives to discuss substantive matters that needed to be addressed in order to facilitate the charter school’s opening. Therefore, the court did not abuse its discretion in holding the Board in contempt.

Extension of the Contract Term

The trial court judgment ordered “that the contract is extended for five (5) years beginning with the 2007-2008 school year.” The Board contends that such an extension was impermissible due to the requirement of LSA-R.S. 17:3983(A)(4)(d) that mandates commencement of a charter school not later than thirty-six months after final approval of the charter if that school is engaged in desegregation compliance issues and further mandates that if operations do not commence within that time, the charter is automatically revoked. Therefore, the Board argues that the charter lapsed as a matter of law and that the contract extension has no legal effect. We disagree. The 119Board breached this contract. Because of the Board’s breach of the contract, Pine Grove could not proceed within the time limits specified by the contract or by statute. This litigation has further delayed performance of the contract. If this court were to accept the Board’s argument, it would allow one party to a contract to prevent the other party from performing the contract until its contractual term or statutory term had elapsed and then claim the court had no right to enforce the contract, because it had expired. We have concluded that Pine Grove is entitled to specific performance of the Charter School Agreement. In order for that to occur, it is entitled to a charter with an initial period of five years. That right cannot be extinguished by the Board’s delaying tactics. Therefore, the trial court was within its legal and equitable authority to extend the term of the contract in order to effectuate the objectives of the contract, the purpose of the Charter School Law, and its judgment. Because additional time has elapsed and will continue to run during this litigation, the extension of the contract term will be modified to provide that the contract will begin to run anew for five (5) years beginning with the first school year following a final judgment in this litigation. See LSA-C.C.P. art. 2164.
THIRD ASSIGNMENT OF ERROR
The Board’s third assignment of error is that the court erred in determining that the Board could not rescind approval of Pine Grove’s charter school application: when that approval was made without compliance with the specific mandates and procedures required by the Charter School Law; when the Board determined that its approval was financially ill advised and detrimental to the public school system; and when, at the time of the Board’s rescission, Pine Grove had not taken any substantial steps in implementing the plans in their charter school application. The Board’s arguments on these issues have been addressed elsewhere in this opinion, so we will merely summarize our conclusions concerning them.
Addressing the last statement first, we again point out that the evidence shows it *226 is simply factually incorrect to assert that Pine Grove had not taken any substantial steps in implementing the plans in their charter school application. Before the Board voted to rescind the Charter School Agreement, Pine Grove had entered into a contract Lpwith a national educational group that would handle the day-to-day administration of the charter school. It had a purchase option on property for the school and had conducted various surveys and appraisals of the site. It had advertised for students and faculty, had held community meetings, had taken enrollment applications from over two hundred students, and had performed many other steps toward opening the charter school. These steps were halted due to the Board’s intransigence. Therefore, this contention is without merit.
We have previously addressed the Board’s argument that it did not have the requisite public meetings before approving the Charter School Agreement, and have concluded that there were public meetings and that notice of those meetings was sufficient to satisfy the statutory mandates. We have also discussed the Board’s claim that its rescission of the agreement should have been upheld by the court due to the financial information developed by the Board following its entry into the contract, and have determined that even if those financial estimates had been adequately established by the evidence, they did not constitute a ground for rescission under either the Charter School Law or the contract at issue. Therefore, we find no merit in the arguments raised in this assignment of error.
CONCLUSION
Based on the foregoing, we interpret the judgment as ordering specific performance of the contract by the Board, and we amend the portion of the judgment extending the contract term of the Charter School Agreement to provide that the contract will run for five (5) years beginning anew with the first school year following a final judgment in this litigation. In all other respects, the judgment of November 20, 2006, is affirmed. All costs of this appeal in the amount of $4,867 are assessed to the Board.
AMENDED IN PART AND AFFIRMED AS AMENDED.
KUHN, J., concurs and assigns reasons.
WELCH, J., concurs in part and dissenting in part with reasons assigned.

. The statutory basis for such a contract is found in LSA-R.S. 17:3971-4001, sometimes referred to in this opinion as the Charter School Law.

. This unpublished action was taken in Hall v. St. Helena Parish School Board, No. 52-1068-D (M.D.La.2004).

. On March 17, 2005, the Board removed the case to the United States District Court for the Middle District of Louisiana, It was remanded to the state court on April 18, 2005, and the Board appealed the remand order to the United States Court of Appeals for the Fifth Circuit. Finding that the Board had not pled facts implicating the jurisdiction of the federal courts, this appeal was dismissed. Charter School of Pine Grove, Inc. v. St. Helena Parish School Board, 417 F.3d 444 (5th Cir.2005).

. The court cited LSA-R.S. 17:3992(C), which provides that a school charter may be revoked by the school board upon a determination by an affirmative vote of at least a majority of the local board membership that the charter school or its officers or employees had done or failed to do certain things enumerated in the statute.

. This judgment was rendered by A. Clayton James, Judge pro tempore presiding.

. The Board filed an appeal of this judgment with this court, but the appeal was dismissed as abandoned after no appellate brief was filed.

. This hearing and the trial on the merits were presided over by Judge Elizabeth P. Wolfe.

. The language of the cited statute was that in effect in 2004. It was amended by 2005 La. Acts, 1st Ex.Sess., No. 35, § 1, but the amendment does not affect this issue.

. The trial court sustained an objection to any testimony concerning whether specific meetings had been called by the Board for the purpose of discussing charter schools, and the Board proffered Baker's testimony that the Board did not comply with the law and did not hold public meetings that the law required. Although we find no error in the court's evidentiary ruling, we have considered this argument in order to fully address the Board's arguments on appeal.

. This sub-paragraph (b) was added to the statute after the Pine Grove charter contract was signed. See 2005 La. Acts, 1st Ex.Sess., No. 35, § 1. Therefore, we consider it inapplicable to that contract. However, in an abundance of caution, we address this argument, because LSA-R.S. 17:3999 requires charter schools to comply with amended provisions of the law within ninety days of their effective date.

. See, e.g., LSA-R.S. 3:313(7) (‘"Political subdivision' means a parish, municipality, and any other unit of local government, including a school board and a special district, authorized by law to perform governmental functions.”); LSA-R.S. 3:313(10) (“'State agency' means any department, office, council, or agency of the state, or any public benefit corporation or authority authorized by the laws of the state.”); LSA-Const. Art. VI, § 44(2) (" 'Political subdivision' means a parish, municipality, and any other unit of local government, including a school board and a special district, authorized by law to perform governmental functions.”); LSA-R.S. 13:5102(A) (" ‘State agency’ does not include any political subdivision or any agency of a political subdivision.”); LSA-R.S. 13:5102(B) ("...'[Political subdivision' means ... [a]ny parish, municipality, special district, school board, ... or an agency or subdivision of any of these, and other public or governmental body of any kind which is not a state agency.”); LSA-R.S. 39:1527(3) (" ‘State agencies’ means the executive branch, the legislative branch, and the judicial branch of state government and the officers and employees thereof, but does not include parish officials ... or their respective officers, deputies, employees, or appointees.”); LSA-R.S. 23:1034 ("For purposes of this Section, 'employees of the state’ means the employees of 'state agencies’ as defined by R.S. 39:1527[3], Employees of political subdivisions shall be provided compensation under this Section by the governing authorities of their respective political subdivisions.”); LSA-R.S. 49:662(A) & (B) (" ‘State agency’ means any board, commission, department, agency, or institution, in-eluding colleges and universities, in the executive, legislative, or judicial branch of the State, or any official or authorized representative of said agency. 'Political subdivision’ means any parish, municipality, or any other unit of local government, including a school board and a special district, authorized by law to perform governmental functions.”); LSA-Const. Art. VII, § 14(A) ("Except as otherwise provided by this constitution, the funds, credit, property, or things of value of the state or of any political subdivision shall not be loaned, pledged, or donated to or for any person, association, or corporation, public or private. Except as otherwise provided in this Section, neither the state nor a political subdivision shall subscribe to or purchase the stock of a corporation or association or for any private enterprise.”)

. We note also that the only case cited in which a local school board was described as an agency of the state was decided before the Louisiana Constitution was revised in 1974; that case cited constitutional provisions which have since been revised to differentiate between state agencies and political subdivisions. See Jefferson Parish Sch. Dist. v. Jefferson Parish Democratic Exec. Comm., 246 La. 51, 163 So.2d 348, 354 (1964). Moreover, the holding of that case was specifically overruled by the supreme court in Caddo Parish Sch. Bd. v. Board of. Elections Supervisors of Caddo Parish, 384 So.2d 448, 453 (La. 1980). Therefore, we do not believe it remains good authority for the statement that local school boards are state agencies as administrators of public education.

. This is a reciprocal obligation; Pine Grove is required to defend and indemnify the Board for any claims brought against the Board as a result of the operations of the *223 charter school. To accomplish this reciprocal obligation, the parties are to purchase liability insurance in an amount sufficient to satisfy all potential claims, with each party naming the other as an additional insured on its policy.

. Having found that a mandamus ruling was legally inappropriate, we address our discussion only to whether the court could reasonably have held the Board in contempt for refusing to obey its preliminary injunction order.